**Allan James BERUBE, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

Civ. No. 68–151.

United States District Court
C. D. California.

April 25, 1968.

———

Allan James Berube, in pro. per.

Wm. Matthew Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief of Criminal Div., and Arnold G. Regardies, Asst. U. S. Atty., Los Angeles, Cal., for respondent.

ORDER DENYING MOTION TO VACATE AND SET ASIDE SENTENCE PURSUANT TO 28 U.S. C.A. § 2255.

HAUK, District Judge.

Petitioner, Allan James Berube, a prisoner at the United States Penitentiary in Atlanta, Georgia, is here upon motion to vacate his judgment of conviction for assaulting federal officers, pursuant

to Section 2255 of Title 28, United States Code.[1] He appears in propria persona.

Allowed to proceed in *forma pauperis,* Berube seeks to vacate his judgment of conviction upon a plea of guilty on the following grounds: (1) that he was mentally incompetent at the time of the offense; (2) that he was mentally incompetent at the time he entered his plea of guilty; (3) that the Court refused his request to be sentenced under Section 4208(b) of Title 18, United States Code; and (4) that he was promised leniency in return for his plea of guilty.

## FACTS AND PROCEEDINGS CONCLUSIVELY SHOWN BY FILES AND RECORDS

A complaint filed with the United States Commissioner on January 10, 1967, by the Federal Bureau of Investigation alleged that petitioner Berube assaulted two special agents of the Federal Bureau of Investigation while they were engaged in the performance of their official duties. Petitioner was in custody at the prison ward of the Los Angeles County General Hospital on the day the complaint was filed, and the Commissioner continued the confinement by committing petitioner to the custody of the United States Marshal.

On January 18, 1967, the Federal Grand Jury returned a one count Indictment[2] charging that on January 7, 1967, petitioner, with an automatic pistol, forcibly assaulted, resisted and interfered with Norbert R. Linker and Jerome K. Crowe while they were engaged in the performance of their official duties as special agents of the Federal Bureau of Investigation, in violation of 18 U.S.C.A. § 111.[3]

1. 28 U.S.C.A. § 2255:

"§ 2255. *Federal custody; remedies on motion attacking sentence*

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized bylaw, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.

An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

2. Indictment No. 193-CD, filed January 18, 1967, United States District Court, Central District of California.

3. 18 U.S.C.A. § 111:

"§ 111. *Assaulting, resisting, or impeding certain officers or employees*

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes

Petitioner was arraigned before this Court on January 23, 1967, and, after conferring with his appointed counsel, Joseph P. Bergman, he entered a plea of not guilty to the one count Indictment. Subsequently, on February 6, 1967, petitioner again appeared before this Court and, through his counsel, moved for a change of plea:

"THE CLERK: 193—Criminal, USA vs. Allan James Berube, B-e-r-u-b-e, change of plea.

"MR. BREGMAN: Joseph Paul Bregman appearing for Berube.

"THE COURT: This is a one-count Indictment charging assault on a Federal officer in violation of 18 U.S.Code 111. Is it your wish to change your plea from not guilty to guilty?

"THE DEFENDANT: Yes, sir.

"THE COURT: Is that your true name, Allan James Berube?

"THE DEFENDANT: Yes, sir.

"THE COURT: Have you received a copy of the Indictment?

"THE DEFENDANT: I have read it, sir.

"THE COURT: Does the defendant waive further reading?

"MR. BREGMAN: So waive.

"THE COURT: Is the defendant ready to enter his plea in this matter, change his plea, I should say?

"MR. BREGMAN: Yes, your Honor.

"THE COURT: In case No. 193, a one-count Indictment, to the charge therein as I have indicated, what is your plea, guilty or not guilty?

"THE DEFENDANT: Guilty.

"THE COURT: Have you discussed with your attorney the facts and circumstances surrounding the offense to which you are pleading guilty?

"THE DEFENDANT: Yes.

"THE COURT: Has he explained to you the maximum penalty the Court may impose?

"THE DEFENDANT: Yes.

"THE COURT: What is it?

"THE DEFENDANT: $10,000 and/or ten years.

"THE COURT: Or both?

"THE DEFENDANT: Or both.

"THE COURT All right. Is this your free and voluntary act, this plea?

"THE DEFENDANT: Yes.

"THE COURT: Has there been any promise of reward or special treatment made to you?

"THE DEFENDANT: No.

"THE COURT: Any threat of coercion or violence used against you?

"THE DEFENDANT: No.

"THE COURT: You are pleading guilty because you are and for no other reason?

"THE DEFENDANT: Yes.

"THE COURT: The Court will find you convicted upon your plea of guilty and set the probation hearing for February 27th at 2:00 p. m. in this courtroom.

"THE CLERK: To remain on bond, your Honor?

"THE COURT: To remain on bond—

"MR. BROWNING: He is in custody.

"THE COURT: What is his bond?

"MR. BROWNING: $50,000.

"THE COURT: All right." (Rep.Tr., Feb. 6, 1967, pp. 12–14)

with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,-000 or imprisoned not more than three years, or both.

Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

When the petitioner appeared for sentencing on February 27, 1967, the Court inquired of him:

"THE CLERK: Item No. 4, United States of America v. Allan James Berube.

"THE COURT: All right. You are here on your plea of guilty to assaulting a federal officer, Code Section 18 USC 111.

"It is time for probation and sentencing, consideration and sentencing.

"Do you have anything to say before I pass sentence?

"MR. BREGMAN: I would like to say something on behalf of Mr. Berube.

"I have read the report and it is obvious that there is a crisis he will be faced with after the disposition of this one. It is quite serious. There are a number of charges, and I am informed that there are also a number of charges that don't appear in the probation report which will be brought once he does get back to North Carolina.

"What is conspicuously absent in the probation report is the lack of a psychiatric report which has never existed in the entire background of Mr. Berube.

"He has been incarcerated for a greater time than he has been outside the Air Force. In fact, I believe as soon as he did leave—

"THE COURT: I know when he was in jail he made some false ID cards.

"MR. BREGMAN: That's precisely it, your Honor. I would recommend that insofar as all of the conduct that he is charged with his been as an adult, primarily—the juvenile record is not there —I would ask that the court consider 4208(b) for further consideration.

"I believe that he is faced here with a fantastic number of years, especially with the charge of kidnaping.

"THE COURT: All right.

"Is there anything further?

"MR. BREGMAN: No, your Honor.

"THE DEFENDANT: That was my desire, your Honor.

"MR. HEUER: I believe incarceration would be the only answer in this case, from the Government's point of view.

"This man did assault with a pistol, which may have been empty, the FBI agents that came to arrest him, and he has a long record of habitual crime.

"I believe in this District it would be appropriate to provide incarceration." (Rep.Tr., Feb. 27, 1967, pp. 4-6)

In the Presentence Report the Probation Officer stated the "Official Version" and then the "Defendant's Version of Offense":

*"Official Version:*

"In the lobby of a local hotel, on the morning of January 7, 1967, two special agents observed an individual who appeared to fit the description of a suspect they were seeking. The agents identified themselves to the defendant, and requested that he produce some identification. Berube then produced an Ohio's driver's license reflecting his name to be Jack Crane. Defendant was then requested to accompany the agents to a nearby lobby wall for the purpose of securing additional identification from him. Instead of producing further identification, defendant turned toward the agents, wielding a hand gun, and threatened to shoot if his commands were not obeyed.

"Berube then attempted flight via the hotel elevator, after having pushed a hotel patron into the elevator. As the elevator door began to close, one of the agents fired one shot, striking him in the center of the abdomen.

"Defendant was immediately driven, by ambulance, to a local emergency hospital where he received temporary treatment. He was then removed to the Los Angeles County General Hospital where surgery was performed and the bullet removed."

*"Defendant's Version of Offense:*

"Defendant admits the present offense as contained in the 'Official Version.'

"The following quotation appears to sum up the defendant's philosophy and attitude regarding the present offense.

" 'If I get the drop on you, you do what I say. If you get the drop on me, I do what you say.'

"Defendant also maintained that if a man is wearing a badge, the same philosophy prevails.

"Defendant also volunteered that he was paroled from the United States Penitentiary at Atlanta, Georgia, on November 18, 1966. Instead of returning to Massachusetts, he traveled briefly to the State of Florida and then went to Shelby, North Carolina, where he committed a bank robbery. Defendant states he received information regarding this bank from a fellow inmate while he was in custody at Atlanta. Upon entering the bank, he told the senior vice president that he was a special agent of the Federal Bureau of Investigation, and presented to the bank official identification which had been made at the Atlanta facility. Berube states he also showed the bank official a .38 caliber police special, when in the official's bank office. Defendant obtained $25,000.00 from the bank, and subsequently took the vice president of the bank to Charlotte, North Carolina, approximately 35 miles, where he let him go. Defendant states he was apprehended one day later in Atlanta, Georgia, and was subsequently returned to the Ashville, North Carolina, County Jail. He indicates while in custody there, a hand gun was smuggled into the jail, and the defendant,

together with two other inmates, escaped from that facility on December 27, 1966. Shortly after the escape the three parties observed an unknown man in a phone booth. They took the victim and the victim's automobile and drove somewhere near Washington, D. C. where the defendant left the group and has not seen them since.

"Defendant states he then went to New York and rented a car in Manhattan. He then drove to Detroit, subsequently flew to Los Angeles, and registered at the hotel in which he was apprehended." (Presentence Report, pp. 2–3)

Taking into consideration the conviction on the one count of the Indictment and the Presentence Report, the Court committed Berube to the custody of the Attorney General for a period of 10 years. In passing sentence the Court also ordered that Berube be eligible for parole pursuant to 18 U.S.C.A. § 4208 (a) (2).[4] (Rep.Tr., Feb. 27, 1967, p. 6; Judgment, Feb. 27, 1967.)

## PETITIONER'S FIRST CONTENTION

*That petitioner was mentally incompetent at the time of the offense.*

Petitioner urges as grounds for relief pursuant to Section 2255 that he was mentally incompetent at the time of the offense.

■ Berube's allegation of insanity at the time of the commission of the crime, which would have been a defense to the Indictment, cannot be raised or considered in a motion to vacate. The rule governing this situation was well stated in Bishop v. United States, 96 U.S.App.D.C. 117, 223 F.2d 582, 584 (1955), rev'd on other grounds, 350 U.S.

---

4. 18 U.S.C.A. § 4208(a) (2):
  "§ 4208. *Fixing eligibility for parole at time of sentencing*
    (a) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interests of the public require that the defendant be sen-

tenced to imprisonment for a term exceeding one year, * * * (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may become eligible for parole at such time as the board of parole may determine."

961, 76 S.Ct. 440, 100 L.Ed. 835 (1956), wherein the court explained:

"The issue of insanity as a defense is presentable upon the trial and appealable if error has been made in respect to it, and a motion to vacate under Section 2255 cannot be used as a substitute for an appeal. Therefore an alleged insanity at the time of the commission of a crime cannot be used as a basis for a motion under Section 2255."

See also Richards v. United States, 342 F. 2d 962, 963 (8th Cir. 1965); Wheeler v. United States, 340 F.2d 119, 121 (8th Cir. 1965); Taylor v. United States, 282 F.2d 16, 21 (8th Cir. 1960); Hallowell v. Hunter, 186 F.2d 873, 874 (10th Cir. 1951); Hahn v. United States, 178 F.2d 11, 12 (10th Cir. 1949).

Accordingly, the first contention raised in petitioner's motion is overwhelmingly refuted by a proper reading of the law.

### PETITIONER'S SECOND CONTENTION

*That petitioner was mentally incompetent at the time he entered his plea of guilty.*

■ When the question of competency is raised under Section 2255, after all trial proceedings have been completed, the burden falls upon the petitioner to establish that he was mentally incompetent. Johnston v. United States, 292 F. 2d 51, 53 (10th Cir.), cert. denied, 368 U. S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961); United States v. Tom, 340 F.2d 127, 128 (2d Cir. 1965); United States v. Bostic, 206 F.Supp. 855, 856–857 (D. D.C.1962), aff'd 115 U.S.App.D.C. 79, 317 F.2d 143, 144 (1963).

In support of the contention that he was mentally incompetent at the time he entered his plea of guilty, petitioner refers to and relies upon medical reports on file at the United States Penitentiary in Atlanta, Georgia. These reports have been obtained, are before the Court and are attached as Appendix I to this Order. They include the following: Admission History and Physical Examination, by David Dean Schmidt, M.D., Surgeon, United States Public Health Service, dated May 16, 1967; Report of Psychiatric Examination, by Joel J. Haffner, M.D., Staff Psychiatrist, dated June 15, 1967; Report of Psychiatric Staff Examination, by Joel J. Haffner, M.D., Staff Psychiatrist, and reviewed by Joseph F. Alderete, M.D., Chief, Psychiatric Service, dated June 22, 1967; and Psychological Report, by George A. Geil, Clinical Psychologist, dated July 21, 1967. These psychological and psychiatric reports unqualifiedly show that petitioner has been at all times mentally competent and able to understand the nature and consequences of the proceedings against him, including the action in this Court where he entered a plea of guilty on February 6, 1967. See Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

■ Accordingly, our study and analysis of these medical reports necessarily compel the conclusion that the petitioner was mentally competent at the time he entered his plea of guilty.

### PETITIONER'S THIRD CONTENTION

*That the Court refused petitioner's request to be sentenced under Section 4208(b) of Title 18, United States Code.*

■ As his third basis of relief under Section 2255, petitioner asserts the refusal of his request that the Court sentence him under 18 U.S.C.A. § 4208(b),[5]

5.  18 U.S.C.A. § 4208(b):
    "§ 4208. *Fixing eligibility for parole at time of sentencing*
    (b) If the court desires more detailed information as a basis for determining the sentence to be imposed, the court may commit the defendant to the custody of the Attorney General, which commitment shall be deemed to be for the maxi-

mum sentence of imprisonment prescribed by law, for a study as described in subsection (c) hereof. The results of such study, together with any recommendations which the Director of the Bureau of Prisons believes would be helpful in determining the disposition of the case, shall be furnished to the court within three months unless the court grants

which relates to a post-judgment examination upon which a judge may alter the sentence of a defendant. Petitioner cites no authority whatsoever in support of this novel contention, and this Court has been unable to find any. Obviously, if the Court feels that it has sufficient information upon which to determine an appropriate sentence for a defendant, there is no requirement that it utilize Section 4208(b) as a vehicle for obtaining additional information which it concludes is neither necessary nor desirable. Therefore this contention is frivolous.

## PETITIONER'S FOURTH CONTENTION

*That leniency was promised in return for a plea of guilty.*

■ Petitioner's final ground for relief, that he was promised leniency in return for his plea of guilty, is conclusively shown by the record to be without merit. Without again quoting or repeating in detail the Reporter's Transcript of the proceedings in court when his plea of guilty was taken, we are convinced that the record unequivocally demonstrates that in response to the Court's careful questioning, the petitioner unmistakably affirmed that he had discussed the nature and circumstances of the offense with his attorney; that his attorney had explained the maximum penalty that the Court could impose; that his plea of guilty was a free and voluntary act; that there had been no promise of reward or special treatment made to him; that

there had not been any threat of coercion or violence; and that he was pleading guilty because he was guilty and for no other reason. Accordingly, it is evident that the Court, in accepting the plea of guilty, fully complied with the requirements of Rule 11, Federal Rules of Criminal Procedure,[6] by making a careful and searching inquiry to insure that the plea was made voluntarily and with full understanding of the charge and consequences of a guilty plea. Harris v. United States, 338 F.2d 75, 80 (9th Cir. 1964).

## CONCLUSION

■ Petitioner's allegations have no substance or support in the record. On the contrary, the four contentions raised in petitioner's motion are overwhelmingly refuted by both the record and a proper reading of the law. Moreover, since petitioner has failed to set forth any grounds entitling him to a hearing, this Court finds that none is necessary.

Petitioner's motion and the files and record conclusively show that the petitioner is entitled to no relief, and particularly to no hearing. 28 U.S.C.A. § 2255.[7] Earley v. United States, 381 F.2d 715, 716 (9th Cir. 1967), citing and quoting United States v. Fleenor, 177 F.2d 482, 484 (7th Cir. 1949).

## ORDER

Now, therefore, it is hereby ordered that petitioner's motion to vacate and set aside sentence pursuant to 28 United States Code 2255 be and the same is denied.

time, not to exceed an additional three months, for further study. After receiving such reports and recommendations, the court may in its discretion: (1) Place the prisoner on probation as authorized by section 3651 of this title, or (2) affirm the sentence of imprisonment originally imposed, or reduce the sentence of imprisonment, and commit the offender under any applicable provisions of law. The term of the sentence shall run from date of original commitment under this section."

6. Fed.R.Crim.P. 11:
   "Rule 11. *Pleas*
   A defendant may plead not guilty, guilty or, with the consent of the court, *nolo*

*contendere.* The court may refuse to accept a plea of guilty, and shall not accept such plea or a plea of *nolo contendere* without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. If a defendant refuses to plead or if the court refuses to accept a plea of guilty or if a defendant corporation fails to appear, the court shall enter a plea of not guilty. The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

7. *Footnote 1, supra.*

## APPENDIX I

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page_____

### CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan, J.          Register Number 0-1221-H

### ADMISSION HISTORY AND PHYSICAL EXAMINATION

HISTORY: This 34 year old male was sent to MCFP for psychiatric observation. Patient claims infrequent headaches for years. On 1/67 patient was shot in stomach, had abdominal surgery and now has intermittent LLQ pain, no nausea or vomiting, no change in bowel habits. No head trauma. Patient has history of narcotic use, Opium and LSD. Admits to moderate use of alcohol. Denies -- allergies, seizures, veneral diseases, and use of tobacco. No familial history of heart disease, hypertension or cancer. Distant relatives on both sides of family have diabetes.

PHYSICAL EXAM: This patient is a well developed, well nourished 34 year old white male, he is ambulatory. Height 75½", weight 165#. Blood pressure 124/85. Pulse 80. Head shows a scar above left ear from bullet wound. Vision 20/20, both; eye movements intact. Hearing and drums normal. Mouth, pharynx, nose, neck, chest, heart, no hernias, genitalia, rectal, back, neurological and lymphatics examined with no abnormalities noted. Abdomen has midline scar from pubos to naval, no tenderness, no masses, or organ enlargement, active bowel sounds. Skin shows scar over left buttock from surgical exploration.

LABORATORY DATA: VERL negative. Hematocrit 45%. Blood group-O. Urinalysis negative.

IMPRESSIONS:     Y00.0 :  No medical disease.

TREATMENT:     None

CONSULT:     None

LIMITATIONS:     None

HOUSING:     Psychiatric

DAVID DEAN SCHMIDT, M.D.
SURGEON (R) USPHS

DDS:jrc
5/16/67

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page____1____

**CLASSIFICATION STUDY**
(Continued)

Committed Name BERUBE, Allan James                Register Number 0-1221-H

REPORT OF PSYCHIATRIC EXAMINATION

I. IDENTIFICATION: Allan James Berube is a 29 year old white married male who was admitted to the Medical Center for Federal Prisoners for the first time on May 12, 1967, charged with bank robbery. He was sent to this institution by the Honorable Wilson Warlick, Chief Judge, United States District Court for the Western District of North Carolina so "That he may be examined medically and psychiatrically to determine his mental condition..."

II. SOURCE OF INFORMATION: The information used to compile this report has been derived from the patient's Central File as well as from interviews with the patient. The former source is considered to be reliable.

III. PRESENTING PROBLEM: The patient states that he had served a sentence for violation of the National Motor Vehicle Transportation Act, in the U.S.P. at Atlanta, Georgia, from January, 1964 through November, 1966. Following his release from that institution he was arrested approximately one week later for alleged bank robbery. The patient stated that he had been considering robbery of some place of business for approximately four months prior to his release. He had been given information about several places. He initially had planned to rob a credit union but when arriving at the place, it was not "layed out" as he had been told. He claimed that he "backed out of there" and picked as his second choice the bank at Shelby, North Carolina. He conceived of a plan on the night prior to the robbery. He thought that he would need some "basic equipment" which included three cars, a gun, and an airplane. However his funds were running low and he envisioned himself at the point of starvation, so he decided to rob the bank without this "basic equipment". He entered the bank on a Saturday at approximately one o'clock, the closing time for the bank, and identified himself as an agent from the Georgia Bureau of Investigation. He stated that the official of the bank accepted him as such and after ushering him into his office, the patient produced a pistol and told the man to obtain some money. He also told the man that he had an accomplice at the official's home who would kill his sick wife if the official phoned the F.B.I. The patient after receiving the money, instructed the man to stay in his office for one hour, doing paper work and not to call the F.B.I. At the last moment the patient thought that the official of the bank would not in fact sit there for an hour but would instead call the F.B.I. He based this upon the bank official's "too agreeable attitude for everything I asked him to do." He then took the bank official with him and drove to Charlotte, North Carolina where he released the man. After that the patient claimed that his plans "crumbled". After releasing the man and seeing him walk into a theatre, the patient believed that the man would call the F.B.I. and identify the automobile in which both were riding. Subsequently the patient decided to drive a few blocks and abandon the car which was rented in his true name. The patient stated that he had approximately $25,000 on his person. He needed to get out of Charlotte, North Carolina, a town in which he had never been before, which reportedly led to his subsequent actions of kidnapping.

Officially the patient is charged with bank robbery and kidnapping under Title 18, U.S.C., Section 2113 (D) and (E). The warrant alleges that on November 26, 1966 in Shelby, North Carolina, at the First National Bank

**10**

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page 2

CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan James          Register Number O-1221-H

of Shelby, North Carolina, the patient produced identification stating that he was from the Georgia Bureau of Investigation. He took a Mr. William E. Pierce, Vice President of the Bank to the vault at gun point and stole $25,000. The patient then took Mr. Pierce as a hostage and released him in Charlotte, North Carolina on November 26, 1966. The patient was subsequently apprehended in Atlanta, Georgia on November 28, 1966.

It is further noted that while awaiting trial the patient escaped from Buncombe County Jail resulting in the following pending charges in the U. S. District Court in Asheville, North Carolina: 1. Kidnapping, violation of Title 18, U.S.C., Section 1201 (A); 2. Escape, violation of Title 18, Section 75 (A); 3. Interstate transportation of a stolen motor vehicle, Title 18, Section 2312. On December 27, 1966 the patient with two other men escaped from the above jail. He allegedly had a pistol smuggled to him in the jail and took the jailer as a hostage after which he stole a car and kidnaped a couple. After abandoning this car he allegedly abducted another man and took his car, driving to Baltimore, Maryland where this man was left tied up but otherwise unharmed. He was subsequently arrested on January 7, 1967 in Los Angeles, California during which time he "pulled a gun and threatened to shoot" the Federal Bureau of Investigation agents. After he had tried to escape one of the agents shot him in the abdomen. In addition to the above pending charges the patient has nine (9) charges outstanding from the Buncombe County Sheriff's Department, Asheville, North Carolina which include escape, Kidnapping, assault with a deadly weapon and possession of a firearm. He also has a detainer on file from the United States Board of Parole.

IV. BACKGROUND INFORMATION: The patient states that he was born on March 22, 1938, the youngest of two children. His mother is approximately 60 years of age, living near Boston, Massachusetts. His father whose age he does not know, was last seen by the patient in June of 1963. Mother and Father are separated and were divorced in 1938 or 1939, re-marrying in 1942 or 1943. The patient's sister is approximately 12 years older than the patient. He remembers living in an orphan's home at approximately age five or six, for one to one and one half years. He returned to live with his mother at approximately age seven and stayed with her until approximately age fifteen or sixteen. He had described his mother as a pleasant individual. He also described the family unit as being close knit.

School History: The patient claimed that he completed his high school education while in the Air Force, receiving his G.E.D. Certificate. He had dropped out of school in the 9th grade to join the Air Force. He stated that his grades were just passing.

Job History: The patient has worked intermittently as a bar tender for approximately one and one half years. He was employed as a radio operator in the Air Force for approximately three years. He has held a number of good paying jobs as an inspector and quality control supervisor in machine parts plants.

Military History: The patient joined the Air Force in March of 19- and was given a bad conduct discharge in March of 1959. At one point he had reached the rank of Corporal. He was given the

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

CLASSIFICATION STUDY
(Continued)

Page 3

Committed Name: STRUBE, Allen James      Register Number: 1221-H

bad conduct discharge for being A.W.O.L. for seven weeks. During his Air
Force tenaur, he had one special and two summary court martials.

Prior Hospitalizations: The patient claims that he was hospitalized
once and that was in January of 1967 when he
had been shot by an F.B.I. man in the abdomen.

Prior Prison Record: The patient's prior record dates from 1958 and
includes desertion from the Air Force, traffic
violation, felonious auto theft for which he received a three year suspend-
ed sentence and placed on probation in 1960. He also was given a two year
sentence at the State Prison in Florida for buying, receiving, or aiding in
concealing stolen property. He was arrested in 1963 for malicious mischief
and in 1963 and 1964 was convicted of violation of the National Motor Veh-
icle Transportation Act for which he served a three year sentence at the
U.S.P. in Atlanta, Georgia. He was released from that institution on parole
in November of 1966 after having given favorable impressions to the offic-
ials at that institution. Examination at that institution revealed a diag-
nostic impression of sociopathic personality but otherwise he was considered
to be in general good health both physically and mentally.

Marital History: The patient claims that he has been married four
times. He claims that he has a wife in Coca Beach,
Florida to whom he is probably still legally married. He has an ex-wife in
Texas who has custody of his two children ages 8 and 4.

Physical Examination: Physical examination done on admission revealed
no significant medical disease. Neurological
examination was within normal limits. There was an abdomenal mid-line scar
from the pubis to the umbilicus as well as a scar over the left buttocks.
Laboratory work which included a test for syphilis, hemogram, and urinalysis
were within normal limits. Chest X-Ray revealed no pathology. An electro-
encephalogram was performed and was interpreted as being within normal limits.

V. MENTAL STATUS EXAMINATION:

General Appearance: The patient appeared to be a well developed, well
nourished man who was in no acute distress. On
his initial interview the patient appeared to be quite anxious and suspic-
ious. He wore dark glasses. He glanced around the room quite suspiciously
and seemed to be very uncomfortable with his back toward the door. He made
statements to the effect that he was hearing voices and that he was afraid
people were going to torture him. The patient was subsequently placed on
anti-psychotic medication and the following day the patient appealed to the
examiner to take him off the medication, saying that he did not need it.
Subsequently he wrote a lengthy note stating that in essence he had been
putting on an act for me as well as Dr. John D. Patton, the psychiatrist
of Asheville, North Carolina to impress us that he was mentally deranged and
incompetent. He decided to change his presentation apparently for the fol-
lowing reasons: 1. He did not like being housed on a close psychiatric
ward and being treated as a "nut" by the custodial officers and his doctor;

**12**

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page ⸺

CLASSIFICATION STUDY
(Continued)

Committed Name ▮▮RUBE, Allan James ⸻⸻⸻    Register Number D-1221-H

2. He has figured that two kidnapping charges will be dropped in light of a recent Connecticut court ruling on the "Lindbergh Act"; 3. Since he thinks that sentences on a "related crime" cannot run consecutively, he will be given a maximum sentence of 25 years and be out of prison in eight years on probation; 4. Eight years in prison he thinks as a regular prisoner would be better than serving 3 to 5 years as a "P" number, (U.S.C., Title 18, Section 4246) at this institution being treated as a "nut"; 5. His life-long aversion to any type of hospital setting.

He claimed that the idea of acting "crazy" was first planted in his mind when in jail in California and later when he went to the U.S.P., Atlanta, Georgia, at which times he was told by friends who "had dealings with the law for 25 years and had done research on "P" cases" that he would be facing life in prison if he didn't start to "act crazy". He made his decision to do so when a judge asked him if he had mental hospitalizations or illness in his past history. He said he became very defensive, denied he had had mental illness and said something to the effect that "I'm not crazy, you must be to think so." He thought the judge would interpret this indication as an indication that he had in fact "mental problems." He claimed he had put on a similar act with Dr. Patton on the 19th of May, 1967 when he was seen for one hour at the County Jail as he did with me, "only more so." He claims at that time he rambled, denied he had ever been in Shelby, North Carolina, remembered being in another city, wandering around with a lot of money and also that he gave nonsence answers to questions such as his date of birth. He stated that he emphasized certain facts regarding a head injury which he sustained in 1960 when it was thought he had a skull fracture. He claims that this interpretation was the result of a reading of a "wet" X-Ray film which was later determined to be non-existent. He thinks that Dr. Patton suggested a number of studies which included an X-Ray, lumbar puncture, and psychiatric testing, based on what he saw of the patient at that time.

The patient does note that for the last ten years he has wondered whether he's had some problems. For example he notes that he has gotten extremely angry in the past for no real justifiable reason. He gave as an example a time when he was driving to Yellowstone National Park with his wife and she had told him the wrong way to go. After finding this out he drove "100 miles an hour on a mountain road", endangering his and her life. Another time he maintains he had a good job and for no apparent reason decided to leave it, sell his home, leave his family, which he did, and

Orientation: The patient was oriented in three spheres (time, place, person.)

Memory and Recall: The patient claims he has had no lapses of memory. He was able to recall what he had for lunch this day. He was able to recall six numbers forward as well as five backward.

Speech: The patient's speech is articulate and exact. It is goal directed and logical.

Mood and Affect: The patient during the latter part of the examination appeared to be somewhat anxious. He also appeared to

Classification Form 1b-Copy
Rev. January 1955

**UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS**

## CLASSIFICATION STUDY
(Continued)

Committed Name BEPUBE, Allan James          Register Number Q-1221-H

be somewhat depressed as evidenced by his facial expressions and his attit-
ude that he didn't care really what happened to him at this point.  He had
attempted to take his life once in 1960 when he lacerated his wrist twice
following an arrest and arraignment just after he had been released from
prison.  At that time he claimed he had a wife and new baby and knew that
he was going back to prison and thought that he had no hope.  He describes
his mood as "being nonchalant and very negative."  He also states that he
becomes quite angry after a series of events and cited as an example the
alleged tampering with his  mail at this institution.  He claimed that he
by-and-large liked to be perfectionistic and to be neat.  He cited as an
example re-typing something five times to get it right.  The patient has
lost some weight since his admission to this institution but he blames this
on the fact that he does not like to eat with negros  and therefore only
eats one meal a day.  He has no apparent problems with his bowels, crying,
or any sleep disturbance.  His affect was appropriate to the verbal content
of his speech.

Abstractions:  To the "spilled milk" proverb he replied, "If you were
complaining about something that happened four months
ago forget it.  Put up with the consequences.  It's too late now."  To
the "don't cross your bridges" proverb he replied, "That might apply to me.
I might talk about it or worry about it but I'm going to wait until I get
to trial and then find out what is going to happen."  To the "rolling
stone" proverb he replied, "If you keep moving and occupied you don't get
stagnant.  You shouldn't cross horses in the middle of the stream.  Like
if you were a Republican you shouldn't cross horses in the middle of the
stream."  To the "glass houses" proverb he replied, "That's like me.  I
couldn't condemn you for stealing a car because I stole a car and I would-
n't condemn you for messing with other women since I've been married four
times.  I couldn't talk about you."  To the similarities between an apple
and an orange he replied,  "The shape is the same and their size is about
the same.  They both come off a tree.  Oranges are orange and apples are
red but they are sometimes green."  To the similarity between a table and
a chair he replied, "They are both pieces of furniture."  To the similari-
ties between a plane and a boat he replied, "They are both used for trans-
portation."  To the similarities between a statue and a poem he replied,
"I don't see no similarities.  Maybe they are some kind of art."

Intellection:  The patient was able to subtract serial sevens in a
somewhat slow manner.  He made one mistake which he
corrected.  The patient was able to describe the events surrounding Viet
Nam although when asked for generalizations he answered in specifics.  He
was able to name the presidents of the United States in reverse order back
to President Franklin Roosevelt.

Judgement:  To the hypothetical situation of finding a letter on the
sidewalk he replied, "I'd mail it."  To the hypothetical
situation of smelling smoke in a theatre he replied, "I'd look around to
see if I could find out where the fire was.  If it got worse I'd tell the
manager."

**14**

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page ___6___

CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan James          Register Number 8-1221-H

**Thought Disorder:** The patient denied on subsequent interviews, that he had ever experienced hallucinations, delusions, depersonalizations, or estrangement. He has had occasional deja vu experiences. He denies any special mission or that there is a plot against him.

**VI. SUMMARY:** This is a 29 year old man who has been sent to this institution charged with bank robbery. He also has a number of other rather serious charges facing him which include kidnapping and assault with a deadly weapon. He has a history of somewhat impulsive actions which are characterized by rather poor judgement. He is obviously an intelligent man. Prior to coming to this institution and while here he apparently decided to put on an act to impress the examining people that he was "crazy" and incompetent to stand trial. He saw this as the only way of beating a life sentence. He subsequently changed his mind about presenting himself as such for reasons enumerated previously. He demonstrates some loosening of thought processes while under pressure although he does not demonstrate any specific thought disorder. Physical and laboratory examinations have been within normal limits, including a neurological exam. It was felt that the patient gave no indication at this time for further medical examinations, such as those suggested by the examining psychiatrist in April of 1967.

**VII. DIAGNOSTIC IMPRESSION:** Sociopathic personality, dyssocial reaction with elements of depression. 326.1.

JOEL J. HAFFNER, M. D.
Staff Psychiatrist

JJH:clh
6-15-67

Classification Form 2-Copy
Rev. January 1939

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS
MEDICAL CENTER FOR FEDERAL PRISONERS
Springfield, Missouri

SPECIAL PROGRESS REPORT

Committed Name **BERUBE, Allan James**　　　Reg. No. **O-1221-H**　　Date

## REPORT OF PSYCHIATRIC STAFF EXAMINATION - 6-22-67

Allan James Berube is a 29-year-old patient who was admitted for the first time to this institution on May 12, 1967 charged with bank robbery. He was committed by the Honorable Wilson Warlick, Chief Judge, U. S. District Court for the Western District of North Carolina so that "...he may be examined medically and psychiatrically to determine his mental condition..."

The patient was seen on this date by the psychiatric staff consisting of Drs. Buschman, Alderete and Haffner for the above purpose. His past history and hospital course were reviewed.

The patient entered the room in an appropriate manner. When asked why he was here, he replied, "This is the neuropsychiatric staffing to determine my competency to return to court." In response to the question as to what he was charged with, the patient replied, "I am charged with a federal offense of bank robbery, Sections a., b., d., and e. and also kidnapping and escape." The patient proceeded to quote the Sections of the U. S. Code under the latter two charges. He was asked to name the officials of the courtroom and he replied, "The judge, the U. S. Attorney, and the Probation Officer." He thought that the function of the Prosecuting Attorney was to prosecute the case against him, that the function of the judge was to see that the proceedings of the courtroom were carried out legally and orderly and that justice was served, and the job of the probation officers was to investigate the facts in the case. When asked when the alleged offense occurred, he replied that the bank robbery and kidnapping had occurred on November 26, 1966. He noted that he had been arrested on January 7, 1967. When asked about his attorneys, he replied that he had two, which were court-appointed. He stated that he understood they were very good and had good reputations. He thought that he could work with his attorneys. He was asked about how he might plead in court and he replied, "I haven't given it too much thought. I plan to move for dismissal of the kidnapping charge." The patient then proceeded to cite the recent decision of a Connecticut court judge regarding the unconstitutionality of the Lindberg Law. When asked if he thought he could testify, he replied, "I can competently but there's not too much I could say in my own behalf." He thought that if someone were to take the witness stand and lie about him that he would handle it by taking it up with his counsel and maybe later appeal. He was asked why he might have been seen as incompetent and he said that he gave　　no particular reason and that he had never been in a mental hospital. In response to the question, "How do you feel psychologically?" he replied, "Normal, I think. I may have a few abnormal things about me but I don't know what they might be. I have been on the outside of the law for the past six or seven years. I have disrespect for the law. I see things a lot differently than you gentlemen do. For example when I read of a robbery in a newspaper, I knew

Classification Form 2-Copy
Rev. January 1939

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page 2.

SPECIAL PROGRESS REPORT

Committed Name    BERUBE, Allan James       Reg. No. O-1221-H       Date

that the robbers' only intent was robbery.  But the owner tried to
assault him with a beer or whiskey bottle and he got killed.  I didn't
feel too much remorse.  If this citizen hadn't taken it upon himself to
be the law, he might still be alive and his wife might still have a
husband and his child still a father."  The patient knew that he would
be returning to a U.S. District Court.  He said very affirmatively that
robbery and kidnapping were violations of the law.  He was asked by
Dr. Alderete if it were a violation of the law should he walk down the
street with a gun.  He replied, "Yes, Sir.  As an ex-convict."  Dr.
Alderete then asked if it would be a violation of the law if he should
start shooting the gun on the street and he replied in the affirmative.
Dr. Alderete then asked if he were in his own home and someone came in
and started shooting at him (the patient), would it be a violation of
the law if the patient shot back.  The patient stated, "I would probably
get away with self-defense in that case."

The patient is presently on no psychotropic medication and none
is deemed necessary while in transit to the court nor while in the
custody of the court awaiting his competency hearing.

It was the unanimous opinion of the Psychiatric Staff that the
patient is ready to return for his competency hearing and that the find-
ings support adjudication of present competence.

REVIEWED:                              FOR THE STAFF:

*Josep F. Alderete, M.D.*              *Joel J. Haffner, M.D.*
JOSEPH F. ALDERETE, M.D.               JOEL J. HAFFNER, M.D.
Chief, Psychiatric Service             Staff Psychiatrist

JJH:gp
PRESENT: Drs. Alderete, Haffner and Buschman.

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

## CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan James

Register Number O-1221-H

### PSYCHOLOGICAL REPORT

REPORT DICTATED: July 19,20, 1967

REFERRAL REASON: Routine psychological testing—mainly Wechsler Adult Intelligence Scale & Rorschach

REFERRING PHYSICIAN: Dr. Haffner *Copy of report attach:*

TESTS ADMINISTERED: Patient intentionally invalidated the group battery of psychological tests administered to him the latter part of May, 1967, with the exception of the Revised Beta Examination. The readministered second batter of psychological tests, administered June 28 and July 3, 1967, included: WAIS    BENDER-GESTALT    PROVERBS    SELF-EXPLORATION TECHNIQUE    CORNELL INDEX    SENTENCE COMPLETION    16 PERSONALITY FACTOR QUESTIONNAIRE    M.M.P.I.    RORSCHACH

DATE OF INTERVIE.: June 28, 1967

IDENTIFICATION:. Allan James Berube, who now claims to have a true age of 29 years with date of birth March 22, 1938, now states that heretofore he had falsified his age to indicate a current age of 34 years. Mr. Berube was received at this Medical Center May 12, 1967, from the U.S. District Court, Western Division, Asheville, North Carolina, and was committed under the provisions of Title 18, Section 4244, USC.  His alleged offense is bank robbery.

Mr. Berube's central file contains a great deal of information concerning his background history and past criminal record. The seriousness of this man's past criminal record is succinctly indicated by a direct quoting from the summary portion of his pre-sentence report:

"This is a case of a 28 year old white male who is charged with bank robbery, two charges of kidnapping, escape, and transportation of a stolen motor vehicle. He also has the following state charges pending:  three escape charges; three kidnapping; four assault with deadly weapon with intent to kill charges.  There is also a detainer on file from the U.S. Board of Parole.  At time of this report, subject is being held by federal authorities in Los Angeles, California, for assault and resisting arrest.  He allegedly tried to shoot two Federal Bureau of Investigation officers while they were arresting him in Los Angeles.

"Berube began serving a five-year prison sentence for two charges of interstate transportation of stolen motor vehicles, in December, 1963.  He was paroled from his sentence on 11-18-66."

ANALYSIS AND INTERPRETATION OF TEST FINDINGS:  At the time of the initial interview, Mr. Berube informed that he had intentionally falsified the answers he had given on the battery of tests originally administered to him during the latter part of May, 1967, with the exception of his having given a valid response to the Revised Beta Examination.  He expressed a willingness to be permitted to take the tests over again, assuring at this time he would make every effort to provide truthful answers to the test items; however, before starting the administration of additional tests, he insisted that examiner should read the memorandum he had prepared, and a copy of which

**18**

Classification Form 1b-Copy
Rev. January 1935

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page 2

CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan James      Register Number 0-1221-H

had been placed in his central file, which concerned the subject of his having claimed the manifestation of fraudulent psychiatric symptoms and his intentionally falsifying his test answers. He produced a typewritten copy of this memorandum which, in part, read as follows:

"...During all this time (November 26, 1966, to March 28, 1967) I had been advised by various people, i.e., friends and acquaintances and associates, (informally advised) to plead insanity to the many charges pending against me. I was not certain as to what to do until the day I spoke with my counsel (Mr. Bruce A. Elmore and Mr. James A. Winner). On this day I was convinced by counsel that the charges against me were very severe and could not be beaten—in fact, would be easy to prove and convict. Then, I had no hope of beating them UNLESS I were found to be incompetent and/or insane now or at the time of the offenses. This is where I began the Academy Award performance. On my first and only visit with Mr. Patton, court appointed psychiatrist, (April 19, 1967) I played a very convincing role of a paranoid—with a suggested history of physical injury (head fracture). It is of interest to note I had just recently finished a novel by Fletcher Knebel, entitled "Night at Camp David", through this acquiring a basic knowledge of a paranoid afflicted person.— Subsequently, my attorneys, acting on a recommendation by Dr. Patton to the court for further tests, filed a motion for these tests...

"I arrived at the Medical Center on May 12, 1967. Within the time period prior to seeing the staff psychiatrist appointed my case, I completed all the psychological tests and the EEG. Please note that the writer, on taking these written tests, avoided the correct or most obvious answers and chose an alternate. On May 22, the writer had finished his first interview with Dr. Haffner, Staff Psychiatrist. From this Award winning performance, I later found out, Dr. Haffner concluded that the patient was "a very, very sick man." Dr. Haffner, after the first interview, prescribed 600 MM of thorazine. (The performance I speak of consisted of: having nervous symptoms; hearing voices; and having bad dreams, etc.; looking all around the room; moving chair and a bizarre tale of 'someone' being after me to inflict torture, etc. A general irrational attitude.)

"After one day of medication, and being housed with perverts, patient began 'wondering' if THIS was really what he wanted. The answer of course is this confession/apology...

"Patient now wants to admit his actions were no more than 'play acting' and AN ATTEMPT TO CONVINCE DOCTORS THAT SUBJECT WAS INCOMPETENT TO STAND TRIAL...

"Patient is sorry for taken advantage of his rights; the U.S. Court; the USMC, and no amount of apologizing will correct the damage done. But patient feels it is better to stand up now and face reality and the charges against him than to continue in this masquerade and hide behind the shield of fraudulent insanity to escape prosecution.

"Patient fully understands the mockery of justice he has made of this entire episode, but hope that all concern will recognize it for what it is. Patient is probably considered to be a sociopathic individual, and a confirmed member of the criminal element, and so being took advantage of what he thought would be an opportunity to 'beat' two possibly death sentences and one life sentence.

Classification Form 1b-Copy
Rev. January 1955

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page 3

## CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan James          Register Number 0-1221-H

"I further submit that I am willing to be retested by any and all of the psychiatric staff."

Signed: Allan James Berube, 0-1221-H
Date: May 29, 1967

On the Revised Beta Examination, Mr. Berube's scores signified bright-normal intellectual functioning with an IQ of 114. An individually administered Wechsler Adult Intelligence Scale netted for him a verbal scale IQ of 107; a performance scale IQ of 101; and a full scale IQ of 105. His Wechsler performances were most outstanding for the occasional appearance of mental blocking and poor quality responses to the test items. For instance, while being administered the information sub-test, he reported that one would have to travel east from Chicago in order to get to Panama. In reporting that Sicily is the capital of Italy, he reported that he felt that he had given a wrong answer, stating "Several things are blocking my mind." He reported Egypt to be in the European continent; he doesn't know how yeast will cause dough to rise; there are about 250 Senators in the United States Senate; water boils at 160 degrees Fahrenheit. Upon being asked to name 3 blood vessels in the human body, he severely blocked after naming arteries and capillaries, stating, "This is impossible that I can't think right now. I just finished a course in First Aid, and I know I know the answer to that." In the Wechsler performance scale, he made an exceedingly low score on the object assembly sub-test. He became greatly confused in how to go about assembling the pieces that go to make up a human profile, only correctly assembling the ear and nose piece at the end of the two-minute time limit. Likewise, he experienced a great deal of difficulty in trying to put together the pieces that make an elephant. Standing in sharp contrast to the poor showing he made on the object assembly sub-test was his superior performance on the digit symbol sub-test, a type of performance that is often given by subjects with high clerical aptitude.

Mr. Berube's reproduced copies of the Bender Visual Motor Gestalt test designs reveal graphic indices of an ambivalent individual, who is apt to manifest both compulsive and impulsive behavior. In this test situation he first started out by making very small figures, which would seem to reveal a tendency to pull back on the self and inhibit spontaneity and outgoingness such as is often found in individuals who fear to release their emotions or give them direct expression. However, he later made figures of much greater size, which would suggest a general lack of control and inhibition. Our patient's projective figure drawing performances (House-Tree-Person) were most outstanding for providing test leads of a subject who is apt to be acutely aware of himself in relation to his environment in general and who will likely attempt to secure satisfaction in activity rather than in fantasy; one with poorly suppressed exhibitionistic tendencies; a deterioration of the body-self image, more frequently seen in mental disease; conflict, or personality disorganization.

The administration of self-report tests readily revealed the heavy reliance Mr. Berube places on denial as an ego defense measure. For instance, he indicated just one significant answer to the list of 100 scorable items that make up the Cornell Index Personality Inventory, and that answer related to his admission that he has had more than three arrests, a fact of record that would be pointless to deny by him. Upon being presented the Projective question, "Who are you?" he gave a highly evasive reply by merely writing, "Allan James Berube, white, male, American, 29-yrs. old, etc....." Upon his being asked to write a short summary of what he considers to be his chief problems, he merely wrote, "Correcting a minute anti-social personality sociopathic reaction." Upon his being asked to characterize his life experiences from the period of his childhood to adulthood, he wrote only, "Normal childhood."

20

Classification Form 1b-Copy
Rev. January 1935

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page 4

CLASSIFICATION STUDY
(Continued)

Committed Name BERUBE, Allan James          O-1221-H
                                            Register Number

However, he did respond somewhat more fully in characterizing his adult life experiences by writing, "Disappointed in adulthood to present due to criminal tendencies acquired & disregard for normal social behavior." In the Sentence Completion test situation, our subject refused to complete a number of the Sentence Completion openings on the basis that he considered them to be "non-applicable" to himself. By means of a later interrogation, he reluctantly revealed an additional amount of personalized information. He informed that the greatest change in his life occurred when he entered the United States Air Force at age 17 years, as by so doing this had deprived him of a teen-age life, has having been thrown in with much older adult subjects. He stated he was 21 years of age when he first met up with serious trouble and that if he could go back to live his life over again he would avoid a life of crime. As indicative of his deeply entrenched anti-social tendencies, he informed that when he is not apprehended for wrong-doing he secures a feeling of accomplishment, and, on the other hand, whenever caught for wrong-doing he suffers from a feeling of failure. He insists that none of his stealing offences were premeditated; they were prompted on the basis of an immediate felt need, such as to get cars to get from one place to another. He related that as a rule he does not become jittery and upset even when confronted with dangerous critical situations. In this regard, he stated, "I can think of only two isolated cases in my life—one case in January 1967 when I was being shot at by the FBI men and I was subsequently wounded. The other time, I was seized by agents of FBI, and I was a little jittery then; they had their rifles out. That was November 1963." As suggestive of aggressiveness and the likelihood of a paranoid-like need for power and control over others, he indicated that if he were an animal instead of a person, he then would most like to be a lion because of the lion's strength and superiority. He expressed the opinion that his mind is excellent, in superior condition. As indicative of his strong denial tendency, he informed that he does not hate, does not lose his self-control, his nerves are satisfactory, he has an optimistic outlook on life, he feels himself as equally as moral as others, and that he does not entertain feelings of inferiority. Upon indicating for him that very close friendships are rare, he stated, "I know it deals with trust and faith; my views on political situations, moral situations, and personal sophistication. I do not care to associate with people who are not sophisticated to a certain degree, with those that do not share the same views." He indicated that happiness and contentment represent the things that he wants most in life and that in the future he is hopeful of being more successful in a legal way. He characterized himself as being one who will fight the hardest whenever a personal principle is involved. The administration of Proverbs tests to Mr. Berube revealed no serious impairment of the ability to think in abstract terms. One of his proverbs interpretations is viewed as meriting special mention, since it provides a reflection of his anti-social orientation. His interpretation of the proverb, "When the cat's away the mice will play," was "A little wrong is generally considered OK if, since no one is around to correct—no one will know."

Amongst other well-recognized personality techniques administered to Mr. Berube were the 16 Personality Factor Questionnaire, the Rorschach, and the Minnesota Multiphasic Personality Inventory. His pattern of 5 highly deviating scores on the 16 Personality Factor test questionnaire was such as would describe a highly adventurous, "Thick-skinned" individual who likes meeting people and being quite impulsive, carefree, and unaware of danger signals. He is further characterized as being highly self-controlled, expedient, self-confident, and apt to show but little inhibition to environmental threat. He is furthermore characterized as a person who is expedient, rudely vigorous, without fears and anxieties, and free from guilt proneness. His indicated low guilt proneness is in keeping with that found in convicts and most distinguishes those who "act-out" their maladjustment from those who suffer it as internal conflict, as is most commonly

Classification Form 1b-Copy
Rev. January 1935

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS

Page 5

**CLASSIFICATION STUDY**
(Continued)

Committed Name BERUBE, Allan James      Register Number O-1221-H

seen in neurotically disturbed individuals.

Mr. Berube gave a Rorschach response record that corresponds very closely to that which Roy Schafer has described in his book Psychoanalytic Interpretation in Rorschach Testing as particularly characterizing pathologically paranoid persons of the constricted sort. It became quite apparent that the relative unstructuredness of this test situation presented a major problem for Mr. Berube, since he was put in a position where he could not be sure of the significance of the stimuli and of his responses. Consequently, it appeared that he became terrified of being "found out" or "misunderstood." Not unlike a paranoid disturbed patient who relies heavily on defensive projection, he exhibited a marked tendency to go into hiding. He outrightly rejected three of the ten Rorschach ink blot configurations for interpretation and rejected many possible responses as inadequate out of paranoid apprehensiveness. He gave the exceedingly meager supply of only seven main responses, which for the most part were quite flat and unrevealing. In five instances out of seven, he showed a limitation of his responses to the popular and near-popular form responses—responses that were clearly "perceptual" rather than "interpretive." Thus, his Rorschach provides reflections of rigid self-restraint and watchfulness over expression of impulse and feeling, absence of spontaneity, and a cautious, hyper-sensitive, playing-it-safe compliance and adaptability.

The administration of the Minnesota Multiphasic Personality Inventory yielded a set of validity scale scores which essentially would describe an overly defensive person who is taking great pains to cover up whatever emotional tension or stress that he may be currently experiencing. Were it not for his over-defensive test taking attitude, his scores on the various clinical scales would have resulted in his securing a much greater elevated clinical profile. Be this as it may, his score on the Psychopathic Deviate (Sociopathic) scale was elevated to a point of statistical significance, and his secondarily most elevated score appeared on the paranoid scale. In making reference to the MMPI research literature, Hathaway and Meehl have reported that subjects scoring highest on these two above mentioned scales, in psychiatric cases, show irritability and suspiciousness, combined with depression, nervousness, and defects in judgment. They stated that some form of conduct disorder characterizes the majority of these patients, although schizophrenia of the paranoid form and paranoid states may also appear. In addition, Mr. Berube's MMPI record was additionally scored on a number of special scales that have been devised by various research investigators on this technique. The findings in this regard reveal him as scoring significantly high on Wiener's two scales for subtle paranoia and subtle psychopathic deviate (sociopathic). Also, on Jenkins's special scale entitled "prognosis for schizophrenia" he scored in the significant range.

PSYCHODIAGNOSTIC IMPRESSIONS: 1. Sociopathic personality disturbance—antisocial reaction. 2. Schizophrenic reaction, constricted paranoid type.

GEORGE A. GEIL
Clinical Psychologist

GAG:fg
7-21-67

| 1. INMATE'S NAME | 2. REGISTRATION NO. | 3. 1ST INSTITUTION | 2ND | 3RD | 4TH | 5TH | 6TH | 7:H | 8TH | 9TH |
|---|---|---|---|---|---|---|---|---|---|---|
| BERUBE, Allen James | 0-1221-H | Springfie' | | | | | | | | |

| 4. TRUE NAME | | |
|---|---|---|
| Same | | |

| 8. ALIAS(S) | 9. SEX | 10. MARITAL STATUS | 11. NO. OF CO-DEFS. |
|---|---|---|---|
| None Listed | ☒ MALE ☐ FEMALE | Married | |

**5. F.B.I. NO.** | **6. SOCIAL SECURITY NO.** 013 28 3657 | **7. CHANGES**

| 12. RACE | 13. DATE OF BIRTH | 14. AGE AT ADMISSION | 15. CITIZENSHIP |
|---|---|---|---|
| White | 3-22-33 | 34 | ☒ U.S. ☐ OTHER |

**16. OFFENSE(S)**
Bank Robbery

DATE SENTENCED: 5-8-67

| 17. SENTENCE PROCEDURE | 18. SENTENCE TERM |
|---|---|
| Title 18; Sec. 4244 CR:1272 | Un-Sentenced |

| 19. FINE (Amount in dollars) | 20. COSTS (Amount in dollars) | 21. SENTENCING JUDGE |
|---|---|---|
| $ None ☐ COMMITTED ☐ PAID | $ None ☐ COMMITTED ☐ PAID | Wilson, Warlick |

| 22. JUDICIAL DISTRICT | 23. HOW COMMITTED | 24. DATE COMMITTED |
|---|---|---|
| Calif. Los Angeles | Title 18; Sec. 4244 | 5-12-67-MCFP |

| | | | | | |
|---|---|---|---|---|---|
| 25. SENT. BEGAN | | | | | |
| 26. ELIG. PAROLE | | | | | |
| 27. EX. W. G. T. | | | | | |
| 28. EX. W. F. T. | | | | | |
| 29. EX. LESS 180 DAYS | | | Subject is also charged with Escape & Kid- | | |
| 30. EX. EXT./PRT. G. T. | | | napping and is under 10 Year Sentence | | |
| 31. G. T. PER MONTH | | | C: Calif, being absent fr. Atlanta on WHC | | |
| 32. TOTAL POS. G. T. | | | | | |
| 33. BASIS FOR CHANGE | xxxxxxxxx | | | | |
| Fall River, Mass. FLM | xxxxxxxxx | | | | |
| 34. NEW TERM | xxxxxxxxx | | | | |

| 35. HIGHEST SCHOOL GRADE COMPLETED | 36. AGE AT COMP. | 37. S.A.T. SCORE (give numerical score) |
|---|---|---|

| 38. INTELLIGENCE LEVEL (give numerical score, written estimate & name of test) | 39. AGE AT 1ST ARREST 25 |
|---|---|

| 40. AGE AT 1ST COMMITMENT | 41. TOTAL NO. OF ARRESTS | 42. LONGEST SINGLE TIME FREE SINCE 1ST COMMITMENT | 43. LONGEST TIME SERVED ON PRIOR COMMITMENT |
|---|---|---|---|
| ☐ NO PRIOR ☐ 16-17 | ☐ NONE ☒ 5-8 | ☐ NO PRIOR COMM. ☒ UNDER 36 MO. | ☐ NONE ☐ 12 MO. UNDER 36 MO. |
| ☐ UNDER 14 ☐ 18-20 | ☐ 1-2 ☐ 9-12 | ☐ UNDER 6 MO. ☐ UNDER 60 MO. | ☐ UNDER 6 MO. ☒ 36 MO. UNDER 60 MO. |
| ☐ 14-15 ☒ OVER 20 | ☐ 3-4 ☒ OVER 12 | ☒ UNDER 18 MO. ☐ 60 MO. OR MORE | ☐ 6 MO. TO 11 MO. ☐ 60 MO. OR MORE |

| 44. TOTAL NO. OF PRIOR COMMITMENTS | 45. MOST SERIOUS PRIOR COMMITMENT |
|---|---|
| 1 B.O.P. INSTS.   1 OTHER INSTS.   2 TOTAL | ☒ ADULT FEL. ☐ JUV. ☐ MISDEM. ☐ NONE |

| 46. PHYSICAL CONDITION UPON ADMISSION   Y00-00 |
|---|
| ☒ SATISFACTORY ☐ REMEDIAL DEFECT OR DISEASE ☐ PERM. DEFECT OR DISEASE ☐ OTHER |

| 47. PSYCHIATRIC CONDITION UPON ADMISSION |
|---|
| ☐ NO PAST OR PRESENT EVIDENCE OF PSYCHOSIS ☒ PRESENT EVIDENCE ☐ PAST EVIDENCE ☐ OTHER   sociopathic personality, antisocial reaction 326 |

| 48. NARCOTICS HISTORY opium & LSD    (above)-w/elements of depression. |
|---|
| ☐ NON USER ☒ MARIJUANA USER ☒ NARCOTICS USER ☐ CERTIFIED NARCOTICS USER ☐ OTHER USER moderate alcohol |

**49. DETAINERS**
Detainers have not been lodged. There are three (3) pending indictments in North Carolina.    None Listed

**50. CO-DEFENDANTS**
None on this offense

**51. REMARKS**

(ED. JULY 1963)     COMMITMENT AND DIAGNOSTIC SUMMARY     RECORD FORM NO. 66
JES #4719