Irene **BARTSCH**, Plaintiff-Appellant,

v.

**METRO–GOLDWYN–MAYER, INC.,**
Defendant-Appellee.

No. 224, Docket 31633.

United States Court of Appeals
Second Circuit.

Argued Dec. 6, 1967.

Decided Feb. 16, 1968.

Monroe E. Stein, New York City (Heit & Rothenberg, New York City, Stanley Rothenberg, New York City, of counsel), for plaintiff-appellant.

Eugene L. Girden, New York City (Coudert Brothers, New York City, Carleton G. Eldridge, Jr., New York City, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from a judgment of the District Court for the Southern District of New York raises the question whether, on the facts here appearing, an assignee of motion picture rights to a musical play is entitled to authorize the telecasting of its copyrighted film. Although the issue seems considerably closer to us than it did to Judge Bryan, we affirm the judgment dismissing the complaint of the copyright owner.

In January 1930, the authors, composers, and publishers of and owners of certain other interests in a German musical play "Wie Einst in Mai," which had been produced in this country as "Maytime" with a changed libretto and score, assigned to Hans Bartsch

the motion picture rights and all our right, title and interest in and in connection with such motion picture rights of the said operetta or musical play, throughout the world, together with the sole and exclusive rights to use, adapt, translate, add to and change the said operetta or musical play and the title thereof in the making of motion picture photoplays, and to project, transmit and otherwise reproduce the said work or any adaptation or version thereof, visually or audibly by the art of cinematography or any process analogous thereto, and to copyright, vend, license and exhibit such motion picture photoplays throughout the world; together with the further sole and exclusive rights by mechanical and/or electrical means to record, reproduce and transmit sound, including spoken words, dialogue, songs and music, and to change such dialogue, if extracted from said works, and to interpolate or use other dialogue, songs and music in or in connection with or as part of said motion picture photoplays, and the exhibition, reproduction and transmission thereof, and to make, use, license, import and vend any and all records or other devices required or desired for any such purposes.

In May of that year Bartsch assigned to Warner Bros. Pictures, Inc.

the motion picture rights throughout the world, in and to a certain musical play entitled "WIE EINST IN MAI," libretto and lyrics by Rudolf Schanzer and Rudolph Bernauer, music by Walter Kollo and Willy Bredschneider, for the full period of all copyrights and any renewed and extended terms thereof, together with the sole and exclusive right to use, adapt, translate, add to, subtract from, interpolate in and change said musical play, and the title thereof (subject so far as the right to use said title is concerned to Paragraph 7 hereof), in the making of motion picture photoplays and to project, transmit and otherwise reproduce the said musical play or any adaptation or version thereof visually or audibly by the art of cinematography or any process analogous thereto, and to copyright, vend, license and exhibit such motion picture photoplays throughout the world, together with the further sole and exclusive right by mechanical and/or electrical means to record, reproduce and transmit sound, including spoken words, dialogue, songs and music, and to change such dialogue, if extracted from said musical play, and at its own expense and responsibility to interpolate and use other dialogue, songs and music in or in connection with or as part of said motion picture photoplays, and the exhibition, reproduction and transmission thereof, and to make, use, license, import, vend and copyright any and all records or other devices made or required or desired for any such purposes.

By another clause Bartsch reserved the right to exercise for himself the rights generally granted to Warner Brothers insofar as these concerned German language motion pictures in certain countries and subject to specified restrictions:

but it is expressly understood and agreed that nothing herein contained shall in any way limit or restrict the absolute right of Purchaser to produce, release, distribute and/or exhibit the photoplay or photoplays produced hereunder based in whole or in part on "Wie Einst in Mai" and/or "Maytime," in all countries of the world, including the territory mentioned in this paragraph, at any time, and regardless of the right herein reserved to the Owner.

A further clause recited

The rights which the Purchaser obtains from the Owner in "Wie Einst in Mai" and/or "Maytime" are specifically limited to those granted herein. All other rights now in existence or which may hereafter come into existence shall always be reserved to the Owner and for his sole benefit, but nothing herein contained shall in any way limit or restrict the rights which Purchaser has acquired or shall hereafter acquire from any other person, firm or corporation in and to "Wie Einst in Mai" and/or "Maytime."

Warner Brothers transferred its rights to defendant Metro-Goldwyn-Mayer, Inc. early in 1935, which made, distributed and exhibited a highly successful motion picture "Maytime." The co-authors of the German libretto, one in 1935 and the other in 1938, transferred all their copyright interests and renewal rights to Bartsch, whose rights in turn have devolved to the plaintiff, his widow. The controversy stems from MGM's licensing its motion picture for television, beginning in 1958.

Although the district judge upheld MGM's contention that the 1930 assignment from Bartsch to Warner Brothers included the right to permit telecasting of the motion picture to be made from the musical play, he thought there was "a further reason why plaintiff cannot prevail in this action," namely, that Bartsch had granted all that he had. This does not do justice to plaintiff's argument. Her position is that in 1930 Bartsch not only did not but could not grant the right to televise the motion picture since, under the similar language of the assignment to him, it was not his to grant; her claim

of infringement is based not on the 1930 assignment to Bartsch of the motion picture rights but on the authors' later assignments of the full copyright.

The district court, appearing to consider that defendant's rights turned on the authorization "to project, transmit and otherwise reproduce the said musical play or any adaptation or version thereof visually and audibly by the art of cinematography *or any process analogous thereto*," concluded that television came within the phrase we have italicized. We have grave doubt on that score. We freely grant that "analogous" is a broader word than "similar," and also that the first step in a telecast of a film, namely, the projection of the motion picture to an electronic pickup, is "analogous" to throwing the picture on a theatre screen. But to characterize the to us nigh miraculous processes whereby these images actuate airwaves so as to cause electronic changes in sets in millions of homes which are then "unscrambled" or "descanned" and thus produce pictures on television screens—along with the simultaneous electronic transmission of sound —as "analogous" to cinematography pushes the analogy beyond the breaking point. This is particularly so since the district court's construction would seem to lead to the conclusion that the assignment would entitle the assignee to "project, transmit and otherwise reproduce" the musical play by a live telecast—a right which pretty clearly was not granted and indeed has not been claimed.

As we read the instruments, defendant's rights do not turn on the language we have been discussing but rather on the broad grant, in the assignments to and from Bartsch, of "the motion picture rights throughout the world," which were spelled out to include the right "to copyright, vend, license and exhibit such motion picture photoplays throughout the world." The "to project, transmit and otherwise reproduce" language appears rather to have been directed at how the musical play was to be made into a photoplay. This may well have seemed a more vexing problem in 1930, due to uncer-

tainties as to the best method for linking visual and audible reproduction, cf. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449. 79 L.Ed. 997 (1935), and whether a grant of motion picture rights to a play or novel included the right to sound reproduction, see L. C. Page & Co. v. Fox Film Corp., 83 F.2d 196 (2 Cir. 1936), than today. Being unclear whether sound reproduction would require alterations in previous methods of converting a play into a photoplay, Warner Brothers sought and obtained a considerable degree of freedom in that regard. On this view the clause whose meaning has been so hotly debated is irrelevant to the point here at issue, and decision turns rather on whether a broad assignment of the right "to copyright, vend, license and exhibit such motion picture photoplays throughout the world" includes the right to "license" a broadcaster to "exhibit" the copyrighted motion picture by a telecast without a further grant by the copyright owner.

 A threshold issue—which the pre-*Erie L. C. Page* decision was not required to take into account—is whether this question should be determined under state or federal law. The seventeenth paragraph of Bartsch's assignment says, somewhat unhelpfully, that "Each and every term of this agreement shall be construed in accordance with the laws of the United States of America *and* of the State of New York." [Emphasis supplied.] We hold that New York law governs. The development of a "federal common law" of contracts is justified only when required by a distinctive national policy and, as we found in T. B. Harms v. Eliscu, 339 F.2d 823, 828 (2 Cir. 1964), citing many cases, "the general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this * * * test." Contrast Murphy v. Colonial Savings and Loan Ass'n, 388 F.2d 609 (2 Cir. 1967), and Ivy Broadcasting Company, Inc. v. American Telephone & Telegraph Co., 391 F.2d 486 (2 Cir. 1968), with McFaddin Express,

Inc. v. Adley Corp., 363 F.2d 546 (2 Cir.), cert. denied, 385 U.S. 900, 87 S.Ct. 206, 17 L.Ed.2d 132 (1966). The fact that plaintiff is seeking a remedy granted by Congress to copyright owners removes any problem of federal jurisdiction but does not mean that federal principles must govern the disposition of every aspect of her claim. Cf. DeSylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956).

Unfortunately, when we turn to state law, we find that it offers little assistance. Two other situations must be distinguished. This is not a case like Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590 (1920), cited with approval, Underhill v. Schenck, 238 N.Y. 7, 143 N.E. 773, 33 A.L.R. 303 (1924), in which an all encompassing grant found in one provision must be limited by the context created by other terms of the agreement indicating that the use of the copyrighted material in only one medium was contemplated. The words of Bartsch's assignment, as we have shown, were well designed to give the assignee the broadest rights with respect to *its* copyrighted property, to wit, the photoplay. "Exhibit" means to "display" or to "show" by any method, and nothing in the rest of the grant sufficiently reveals a contrary intention.[1] Nor is this case like Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1938), in which the new medium was completely unknown at the time when the contract was written. Rather, the trial court correctly found that, "During 1930 the future possibilities of television were recognized by knowledgeable people in the entertainment and motion picture industries," though surely not in the scope it has attained. While *Kirke La Shelle* teaches that New York will not charge a grantor with the duty of expressly saving television rights when he could not know of the invention's existence, we have found no case holding that an experienced businessman like Bartsch is not bound by the natural implications of the language he accepted when he had reason to know of the new medium's potential.[2]

Plaintiff, naturally enough, would not frame the issue in precisely this way. Instead, she argues that even in 1930 Warner Brothers often attempted to obtain an express grant of television rights and that its failure to succeed in Bartsch's case should persuade us that, despite the broad language, only established forms of exhibition were contemplated. She buttresses this argument by producing a number of 1930 assignments to Warner Brothers, some of which specifically granted the right to televise motion pictures and others of which granted full television rights, and by adducing testimony of the Warner Brothers lawyer who had approved the assignment from Bartsch that on many occasions Warner Brothers attempted to secure an express grant of such rights but did not always succeed.

However, this is not enough to show that the Bartsch assignments were a case of that sort. For all that appears Warner Brothers may have decided that, in dealing with Bartsch, it would be better tactics to rely on general words that were sufficiently broad rather

1. The plaintiff points to paragraph 13 of the agreement, reproduced in the text, as indicating an intention to exclude television rights. The provision limits the rights of the assignee to those "specifically * * * granted herein," and saves to Bartsch "all other rights now in existence or which may hereafter come into existence." We cannot read this as standing for more than the truism that whatever Bartsch had not granted, he had retained.

2. In Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481, cert. denied, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956), the Third Circuit, applying Pennsylvania law, held that a 1935 contract granting moving picture rights did not permit the grantee to televise the film. However, unlike Bartsch, the grantor, Ettore, was not an experienced businessman but a prize fighter, and the Court relied heavily on his lack of sophistication in determining whether it was fair to charge him with knowledge of the new medium. ld. at 491, n. 14.

than seek an express inclusion and perhaps end up with the opposite, or may have used a form regular in the industry without thinking very precisely about television, or—perhaps most likely—may simply have parroted the language in the grant from Bartsch's assignors to him on the theory it would thus be getting all he had, whatever that might be. Indeed, it is really the assignment to Bartsch rather than the one from him that must control.[3] While plaintiff suggests that Warner Brothers may have furnished Bartsch the forms to be used with his assignors, this is sheer speculation. There is no showing that the form was unique to Warner Brothers; indeed the contrary appears.

With Bartsch dead, his grantors apparently so, and the Warner Brothers lawyer understandably having no recollection of the negotiation, any effort to reconstruct what the parties actually intended nearly forty years ago is doomed to failure. In the end, decision must turn, as Professor Nimmer has suggested, The Law of Copyright § 125.3 (1964), on a choice between two basic approaches more than on an attempt to distill decisive meaning out of language that very likely had none. As between an approach that "a license of rights in a given medium (e. g., 'motion picture rights') includes only such uses as fall within the unambiguous core meaning of the term (e. g., exhibition of motion picture film in motion picture theaters) and exclude any uses which lie within the ambiguous penumbra (e. g., exhibition of motion picture film on television)" and another whereby "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license," he prefers the latter. So do we. But see Warner, Radio and Television Rights § 52 (1953). If the words are broad enough to cover the new use, it seems fairer that the burden of framing and negotiating an exception should fall on the grantor; if Bartsch or his assignors had desired to limit "exhibition" of the motion picture to the conventional method where light is carried from a projector to a screen directly beheld by the viewer, they could have said so. A further reason favoring the broader view in a case like this is that it provides a single person who can make the copyrighted work available to the public over the penumbral medium, whereas the narrower one involves the risk that a deadlock between the grantor and the grantee might prevent the work's being shown over the new medium at all. Quite apart from the probable impracticality, the assignments are broad enough even on plaintiff's view to prevent the copyright owners from licensing anyone else to make a photoplay for telecasting. The risk that some May might find the nation's television screens bereft of the annual display of "Maytime," interlarded with the usual liberal diet of commercials, is not one a court can take lightly.

Affirmed.

---

3. From all that appears, it would seem that this first assignment was negotiated in Germany and that German law would apply in its interpretation. Since neither party has suggested that German law differs from New York law in any relevant respect, we have not embarked on an independent investigation of the matter. El Hoss Engineering & Transportation Co. v. American Independent Oil Co., 183 F.Supp. 394, 399 (S.D.N.Y.1960), rev'd on other grounds, 289 F.2d 346 (2 Cir.), cert. denied, 368 U.S. 837, 82 S.Ct. 51, 7 L.Ed.2d 38 (1961). Though new Rule 44.1 establishes that courts may, in their discretion, examine foreign legal sources independently, it does not require them to do so in the absence of any suggestion that such a course will be fruitful or any help from the parties. Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die Hard Doctrine, 65 Mich.L.Rev. 615, 692–702 (1967).