United States Court of Appeals,

Fifth Circuit.

No. 93-1829.

John BLOOM and Jim Atkinson, Plaintiffs-Appellants,

v.

HEARST ENTERTAINMENT, INC., et al., Defendants-Appellees.

Sept. 29, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before GOLDBERG, KING and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

John Bloom and Jim Atkinson ("appellants") appeal from a decision of the Northern District of Texas in a contract dispute. Appellants brought suit in Texas State Court against appellees, claiming that they possessed the home video rights to a motion picture based on a book written by them. The appellees removed the case to the federal district court. The District Court ruled against the appellants, issuing findings of fact and conclusions of law that held the appellants did convey the home video rights in controversy here to the appellees. The appellants appealed the District Court's ruling to this court. We affirm.

## BACKGROUND

In 1981, the appellants wrote a book entitled *Evidence of Love.* The book was an account of a well publicized axe murder of a housewife in Wylie, Texas in 1980. On March 22, 1981, the appellants entered into an agreement with Texas Monthly Press, Inc. ("TMP") to publish the manuscript. As part of this agreement, the

1

appellants also granted TMP broad powers with respect to *Evidence of Love,* including:

> The Authors hereby grant and assign solely and exclusively to the Publisher throughout the world during the full term of copyright and all renewals thereof on the terms set out in the Agreement, the book and volume publishing right in the English language throughout the world in [*Evidence of Love* ] along with the following rights; abridgement, syndication, radio broadcasting, television, mechanical recording and rendition, projection, Braille, microfilm, translation, dramatic, and motion pictures; ancillary commercial promotion rights, together with the right to grant licenses for the exercise of and/or to dispose of any or all of the rights granted.

The District Court found that by this agreement (hereinafter referred to as the "Publishing Contract") the appellants granted all the rights they had in *Evidence of Love* to TMP, including the home video rights.

*Evidence of Love* was published in book form by TMP in 1984, and pursuant to its agreement with the appellants, TMP engaged the services of Triad Artists, Inc. ("Triad") to sell the movie rights. In June 1987, Triad entered into negotiations with Hearst Entertainment, Inc. and Phoenix Entertainment Group, which is King Phoenix Entertainment's predecessor-in-interest (hereinafter referred to collectively as "Phoenix"). The two principal negotiators were Caitlin Buchman, representing Triad, and Marvin Katz, representing Phoenix.

Buchman and Katz reached an agreement on the movie rights which is the focus of the present controversy. This agreement was an option contract consisting of eleven sections. Section 1 of the contract states, in relevant part:

> [Phoenix] shall be granted, upon execution hereof, an exclusive three month free option to acquire *exclusive*

> *worldwide motion picture and television rights* in and to
> [*Evidence of Love* ].  (emphasis provided).

The remainder of this clause ("granting clause") details how the option was to be extended and the option price.  In section 6 of the contract ("reservation clause") Triad reserved certain rights on TMP's behalf.  Specifically, the contract stated that TMP reserved all rights not expressly granted, and reserved the publication, live stage, and radio rights.  Finally, section 11 of the contract provided that all disputes arising under the contract would be settled in accordance with New York law.

The appellants and their agent, Vickie Eisenberg, were aware of the negotiations between TMP and Phoenix.  Although the appellants were not parties to the negotiations between TMP and Phoenix, drafts of the contract were made available to the appellants, and they expressed no reservations concerning the agreement.  In November 1989, Phoenix and TMP reached an agreement on an option contract to buy the movie rights to *Evidence of Love.*  Phoenix exercised its option to the movie rights for *Evidence of Love* in January 1990.  By exercising its option with TMP, Phoenix was vested of all the rights under the option contract (hereinafter referred to as the "Movie Rights Contract").

The same month that Phoenix and TMP executed the Movie Rights Contract, the appellant's attorney sent TMP a letter stating that the appellants were displeased with the terms of the sale of the movie rights to *Evidence of Love.*  The appellants were upset that they were not given a creative role in the making of the motion picture, were not chosen to write the screenplay, and did not have

3

a voice in choosing the director. The appellants threatened to sue TMP for the alleged mishandling of the agreement with Phoenix, and demanded that TMP reconvey to the appellants whatever rights TMP retained in *Evidence of Love* under the Movie Rights Contract. In response to these demands, TMP sued the appellants in Texas State Court for a declaratory judgment regarding the parties rights under the Publishing Contract between the appellants and TMP. Appellants and TMP settled this suit in February 1990, with TMP assigning whatever rights it retained in *Evidence of Love* under the Movie Rights Contract to the appellants. Under this settlement the appellants stepped into TMP's shoes with regard to TMP's rights in *Evidence of Love* and its relationship to Phoenix.

Meanwhile, Phoenix entered into an agreement with the CBS Television Network to air the movie adaptation of *Evidence of Love,* entitled "Killing in a Small Town." The program aired on May 22, 1990. In June 1990, the appellants read a newspaper article stating that "Killing in a Small Town" was going to be theatrically released abroad that summer. In reaction to this article, the appellants contacted Phoenix, seeking the additional funds they would be entitled to if the movie were to be released abroad. Phoenix claimed that the article was mistaken and that there was to be no foreign release, but rather that Phoenix had licensed the motion picture to international home video distributors and television broadcasters. The appellants informed Phoenix of their belief that the Movie Rights Contract did not grant Phoenix any rights to the home video of *Evidence of Love.* Phoenix disagreed

4

with the appellants and asserted that it did have home video rights under the Movie Rights Contract. A few months later the appellants instituted an action against Phoenix in Texas State Court. Phoenix promptly removed the matter to the federal district court, and the appellants' appeal from the District Court's verdict is before us today.

## DISCUSSION

The appellants' first assertion is that the District Court erred in holding that the granting clause of the Movie Rights Contract was ambiguous. They argue that the language of the granting clause is clear: that "exclusive worldwide motion picture and television rights" means precisely what it says, and since there is no mention of home video rights, then those rights were obviously not granted. Conversely, Phoenix contends that the granting clause is ambiguous in regard to whether or not it conveys the video rights.

Determining whether a contract is ambiguous is a question of law. *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2nd Cir.1987); *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2nd Cir.1990). A term is ambiguous if it is susceptible to "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk-In Medical,* 818 F.2d at 263 (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp.

5

987, 994 (S.D.N.Y.1968)). Also, a determination of ambiguity should be made solely in reference to the language of the contract; extrinsic evidence should only be admitted after the contract is found to be ambiguous. *Curry Road Ltd.,* 893 F.2d at 511. The Uniform Commercial Code, as adopted in New York, makes an exception to the exclusion of extrinsic evidence for the purposes of proving that a contract term is not ambiguous in light of usage of trade, course of dealing or course of performance. N.Y.U.C.C. § 2-202, Official Comment 1. Generally, determining whether a contract term is ambiguous is a question of law and would call for a *de novo* review of the District Court's determination. *Paragon Resources, Inc. v. Nat. Fuel Gas Distribution,* 695 F.2d 991, 995 (5th Cir.1983) (applying New York law). However, it is not clear whether the admission of extrinsic evidence of usage of trade to determine ambiguity in a contract makes it a factual determination, a mixed question of law and fact, or whether it remains a purely legal question. We shall wrangle with this question further below, but for now it will suffice to say that we agree with the District Court in holding that the granting clause in question is ambiguous.

In order to find that a contract is ambiguous, in whole or in part, we must believe that it can be construed to mean two different things. The appellant's assertion that "worldwide motion picture and television rights" excludes video rights is arguably a reasonable construction of the clause. Appellants argue that "motion pictures" could refer exclusively to movies made for theatrical release, and "television" could just mean made-for-TV

movies, and never the "twain shall meet. However, Phoenix's contention that the granting clause does include video rights is also a reasonable construction. At its most basic level, what is a video, if not a motion picture displayed on a television set? This observation is also supported by the precise definitions of the relevant terms. Webster's Ninth New Collegiate Dictionary defines video as follows: "a recording of a *motion picture* or *television program* for playing through a *television set.*" (emphasis provided). It is not unreasonable to conclude that video rights lie at the intersection of motion picture and television rights, and hence, a grant of motion picture and television rights could include video rights as well.

The appellants argue that the industry custom and usage of the contract terms should, as a matter of law, control our determination of what is ambiguous. *See, Personal Preference Video, Inc. v. Home Box Office, Inc.,* 986 F.2d 110, 114 (5th Cir.1993) (applying New York law). We agree that industry custom and usage is a determinative factor in discovering whether a contract term is ambiguous. However, the appellants argue further that given the importance of evidence of industry custom and usage, the District Court made a reversible error by discounting the testimony of the appellant's expert, Paul Almond. The issue the appellants pose is simply one of what standard of review to apply to a lower court's determination that a contract term is ambiguous after considering evidence of usage of trade. Generally, whether a contract is ambiguous is a question of law, and if it is

7

ambiguous and extrinsic evidence is allowed, then the determination becomes a factual inquiry.  Each particular inquiry has its own, well defined, standard of review.  However, where extrinsic evidence of industry custom and usage is admitted to determine whether a contract term is ambiguous, it is not clear what the standard of review should be.

In *Paragon Resources, supra,* the Fifth Circuit was confronted with the conundrum of what standard of review to apply to a lower court's determination of whether a contract was ambiguous in light of industry custom.  In writing for the court, Judge Higginbotham clarified the issue in a case such as the one before us today:

> The U.C.C. thus adds a third level to a traditional two-level inquiry.  Instead of asking, "Were the contract terms ambiguous" and then, "If they were ambiguous what do they mean in light of extrinsic evidence" the Code poses *three* inquiries:
>
> 1. Were the express contract terms ambiguous?
>
> 2. If not, are they ambiguous after considering evidence of course of dealing, usage of trade, and course of performance?
>
> 3. If the express contract terms by themselves are ambiguous, or if the terms are ambiguous when course of dealing, usage of trade, and course of performance are considered (that is, if the answer to either of the first two questions is yes), what is the meaning of the contract in light of *all* extrinsic evidence?
>
> The first inquiry presents a question of law.  The third inquiry presents a question of fact.  The thorny problem is classifying the second inquiry as one of law or fact or both.

*Id.* at 996 (emphasis in original).  The *Paragon* court did not have to resolve this "thorny" issue because the court found that, as a matter of law, the language was ambiguous without resort to evidence of custom, and thus the lower court judge properly

8

considered all pertinent forms of extrinsic evidence. 695 F.2d at 996.

In another Fifth Circuit case applying New York law, *Personal Preference, supra,* the court resolved the standard of review issue by announcing that its decision would have been the same under both the *de novo* and clearly erroneous standards of review. In this case, the trial court had to determine whether the words "closed-circuit television" rights were ambiguous. The trial court answered in the affirmative and allowed extrinsic evidence of trade usage of the words to be presented to the jury. The jury returned a verdict for the plaintiff and on appeal the Fifth Circuit reversed. In doing so the court first held, under *de novo* review, that the term "closed-circuit television" was not ambiguous. 986 F.2d at 114. Then the court argued alternatively that, "[t]o the extent that the industry meaning of the term closed circuit might be considered a question of fact under New York law, we note that the *overwhelming* evidence demonstrates as a matter of law that, in the boxing industry, closed circuit refers to a type of venue, not the method of transmitting the television signal." *Id.* (emphasis in original).

Because we find that the Movie Rights Contract is ambiguous as a matter of law, in regard to the disposition of video rights, we shall follow the course taken in *Paragon.* We have already explained that the vagaries of the definitions of television and motion picture rights, in this era of multi-media, can embody the idea of video rights based solely on the lexicographical meaning of

9

the words involved. Semantics aside, though, there is other evidence of the ambiguity of the granting clause when we consider the entire agreement represented in the Movie Rights Contract.

In addition to the overlap in meaning of some of its key terms, the Movie Rights Contract is also ambiguous because, under the circumstances, it is inconsistent to retain video rights when motion picture rights are being sold. There is nothing to be gained by the reservation of video rights when a video cannot be produced without creating a motion picture—a right the appellants concededly do not have here. It is possible that TMP (and the appellants as TMP's successors-in-interest) could have wanted to retain home video rights for the purposes of preventing the motion picture and television market from being diluted. Yet that would be a curious result in light of the fact that, in the very agreement by which TMP retained video rights, it divested itself of any interest in the motion picture and television rights. In any event, a reservation of home video rights should certainly have been explicitly reserved—if that were the intent—and should have been expressly granted—if that were the intent—and therein lies the ambiguity.

Having properly held that the granting clause of the contract was ambiguous, the District Judge was correct in admitting extrinsic evidence to determine the intent of the parties. The proper standard of review of the District Court's findings is clearly erroneous. *Paragon Resources,* 695 F.2d at 996; *Eskimo Pie Corp.,* 284 F.Supp. at 991-95. The District Judge reviewed a good

deal of extrinsic evidence, most of which was damaging to the appellants. Perhaps most significant was the testimony of the persons negotiating the agreement. Both Buchman and Katz, negotiators for Triad and Phoenix respectively, testified that they acted under the belief that they were transferring the video rights to *Evidence of Love* in the Movie Rights Contract. Furthermore, Buchman testified that she would have found it highly unusual to retain the video rights when the motion picture and television rights were being sold. It is not often that such agreement is found in a contract dispute, and one would be hard pressed to imagine more compelling extrinsic evidence of the parties' intent than the unanimous assent of opposing negotiators.

There is other evidence indicating that the appellants did not, and had no intention to, retain the video rights to their book. In the Publishing Contract, the appellants granted the broadest possible rights in their work to TMP. If the appellants were so concerned with the retention of video rights, they would not have granted them to TMP. Also, during the negotiations between TMP and Phoenix, the appellants were given copies of each subsequent agreement drafted and were kept abreast of the progress between the parties. Not once did the appellants make any objection or inquiry concerning the video rights.

Further, although certain rights were reserved in the reservation clause of the Movie Rights Contract, TMP did not reserve the video rights. The appellants are beneficiaries of a general "reservation of all rights not granted" clause, but in

light of the specific recitals of rights reserved immediately following it, this general reservation clause is of little benefit. The rule of *ejusdem generis* applies where specific recitals in a contract are either preceded or followed by an omnibus clause that retains all rights not mentioned. In such circumstance, courts often apply the rule to limit the actual rights reserved to those specifically mentioned, or rights intimately analogous to those mentioned. As such, having chosen not to specifically reserve the video rights in their reservation clause, the appellants cannot prosper by this boilerplate, catch-all clause. *Herman v. Malamed,* 110 A.D.2d 575, 487 N.Y.S.2d 791 (1st Dept.1985); *Forward Industries, Inc. v. Rolm of New York Corp.,* 123 A.D.2d 374, 506 N.Y.S.2d 453 (2nd Dept.1986). Based on the foregoing evidence adduced at trial, we hold that the District Court's ruling was not clearly erroneous, in that the evidence supports the contention that the appellants did not retain the video rights to *Evidence of Love.*

In addition, the New York rules of contract construction also militate against a finding that the appellants reserved video rights. One case that is particularly relevant to the controversy at hand is *Bartsch v. Metro-Goldwyn-Mayer, Inc.,* 391 F.2d 150 (2nd Cir.), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968). In that case, Bartsch granted to MGM "motion picture rights throughout the world, in and to a certain musical play ... together with the sole and exclusive right to ... copyright, vend, license and exhibit such motion picture photoplays throughout the

12

world." Bartsch sold his rights in the play in 1930. *Id.* at 151-53. Several years later, MGM decided to make a television adaptation of the play, and Bartsch's estate sued, alleging that television rights had not been granted. The *Bartsch* court began its analysis by pointing out that the Bartsch had given to MGM the broadest possible grant of rights in the play. *Id.* at 154. It then noted that the grant of rights was not limited in any meaningful sense.[1] Finally, the court found that although television was not as pervasive when the contract was entered into as it was at the time of the suit, the record indicated that the growth of television was foreseeable when Bartsch sold his rights in the play. With these findings, the *Bartsch* court developed a rule which is particularly applicable to the case at bar: when a broad grant of rights is made in a contract, and a new use can be construed to fall within that grant, and that use was foreseeable at the time the grant was made, then the burden shall be on the grantor to reserve the right to the new, but foreseeable, use. *Id.* at 155; *see also, Landon v. Twentieth Century-Fox Film Corp.,* 384 F.Supp. 450, 452 (S.D.N.Y.1974).

This rule is well suited to the present controversy. First, the grant made to Phoenix was broad. Although the appellants argue otherwise, the grant of "exclusive world wide motion picture and television rights" is quite similar to language that other courts

---

[1]Bartsch's contract with MGM contained a general reservation clause similar to the one appellants have here. For reasons in accord with those provided above, the *Bartsch* court gave no significance to the general reservation clause.

have construed as broad. In *Platinum Record Co. v. Lucasfilm, Ltd.,* 566 F.Supp. 226 (D.N.J.1983), the court read an assignment of the right to use the plaintiff's copyrighted songs in a motion picture to be broad enough to include the right to use the songs in the production of a home video. This case involved a grant of rights to use the plaintiff's copyrighted songs in the defendant's motion picture. When the defendant released a home video version of the motion picture the plaintiffs sued, alleging a copyright infringement. The District Court relied on *Bartsch* in rejecting the plaintiffs contention that a grant of motion picture rights was not broad enough to include the use of home video. *Id.* at 227-28.

In *Philadelphia Orchestra Ass'n v. Walt Disney Co.,* 821 F.Supp. 341 (E.D.Pa.1983), the Orchestra's grant of the right to use its performance in a "feature picture," was deemed to be broad enough to include the right to use the performance in a home video. In answering the Orchestra's assertion that the term "feature picture" cannot be taken to include a video, the court said "the word "feature' refers to films of a certain length without regard to the medium or location in which they are presented.... [T]he common usage of the phrase "feature film' does not necessarily imply a presentation in a theatre outside of the home." *Id*. at 345. The same is true here, except that the appellants did not even limit the motion picture rights they granted to Phoenix with any qualifier. This does not necessarily mean, and we do not today hold, that every grant of motion picture rights automatically includes the right to produce videos. Rather, we hold that a

14

general grant of motion picture rights is potentially broad enough to contemplate the later use of video as means of distribution. *See also, Rooney v. Columbia Pictures Industries, Inc.,* 538 F.Supp. 211 (S.D.N.Y.), *aff'd,* 714 F.2d 117 (2nd Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *Brown v. Twentieth Century Fox Film Corp.,* 799 F.Supp. 166 (D.D.C.1992).

All that remains to satisfy the *Bartsch* test is that the new use be foreseeable, and that the appellants did not specifically reserve the video rights. It is not contestable that when the grant to Phoenix was made in June 1988 the use of video as a medium for the distribution of motion pictures was foreseeable. The home video may not have been an antiquity in 1988, but it had certainly been with us long enough for the appellants to be cognizant of its existence. The appellants do not contend otherwise, nor could they, since they are claiming that they actually intended to reserve the video rights to their book. It is also not in dispute that the appellants did not specifically reserve the video rights. There is no mention of video rights in the Movie Rights Contract and, in fact, the record indicates that video rights were not expressly mentioned by any party to this litigation until after the Movie Rights Contract was entered into. Therefore, the rule enunciated in *Bartsch* controls in this case and compels a judgment in Phoenix's favor.

## CONCLUSION

In sum, we hold that the granting clause whereby the appellants sold their rights to *Evidence of Love* was ambiguous as

15

a matter of law.  As such the District Court properly considered extrinsic evidence of the parties' intent, which overwhelmingly indicates that the appellants intended to transfer the video rights to the book.  Furthermore, we hold that under New York rules of contract construction, the burden was on the appellants to reserve video rights to their work, if such was their intent.  Therefore, the appellants have conveyed their interests in the video rights of their book and, since Phoenix owns such rights, its licensing of its copyrighted motion picture based on said book for home video does not constitute any infringement of whatever rights the appellants may have retained in their book.

The judgment of the District Court is AFFIRMED.