THIRD DIVISION
March 26, 2008

No. 1-07-0626

| | | |
|---|---|---|
| INTERSPORT, INC., | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 06 CH 04874 |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION and MARCH MADNESS ATHLETIC | ) | |
| ASSOCIATION, L.L.C., | ) | Honorable |
| | ) | Stuart Palmer, |
| Defendants-Appellants. | ) | Judge Presiding. |

      JUSTICE THEIS delivered the opinion of the court:

      Defendants, the National Collegiate Athletic Association (the NCAA) and the March Madness Athletic Association, L.L.C. (the MMAA), appeal from the order of the circuit court of Cook County entering a declaratory judgment in favor of plaintiff Intersport, Inc. Specifically, the circuit court found that Intersport's license from the MMAA to use the trademark term "March Madness" to "advertise, promote, and sell videos" of certain sports programming encompassed the right to distribute content to video-enabled wireless communications devices on demand. On appeal, defendants now contend that: (1) the circuit court erred in interpreting the term "videos" as including material transmitted to Sprint PCS cell phone customers on demand; (2) the circuit court impermissibly rewrote the language of Intersport's license agreement; and (3) the circuit court had an insufficient factual basis to enter judgment on Intersport's declaratory judgment claim. For the following reasons, we affirm the judgment of the circuit court.

The record discloses that Intersport filed an amended verified complaint for declaratory relief alleging the following facts relevant to this appeal. Intersport produces sports-related programming for broadcast in a range of media, including television programming featuring college basketball coaches discussing and analyzing the NCAA men's Division I college basketball tournament (the Coaches Shows). Intersport's Coaches Shows have been broadcast on ESPN, Fox Sports Network, and elsewhere.

Intersport has been using the term "March Madness" in connection with its programming since 1986. In 1989, Intersport registered the term "March Madness" as a service mark with the United States Patent and Trademark Office. The registration was for the purpose of using the term in connection with Intersport's business.

However, in 1990, the Illinois High School Association (the IHSA) sought to register the mark, claiming that it had used the term "March Madness" in connection with its state high school basketball championships since the 1940s. The IHSA discovered Intersport's registration, and a dispute ensued. Ultimately, the IHSA and Intersport agreed to resolve any dispute regarding the ownership of the mark by pooling their trademark rights into a new entity, March Madness, L.L.C. This arrangement continued until 1995, when the IHSA became involved in a dispute with the NCAA over the use of the term. At that time, Intersport assigned its rights in the March Madness mark to the IHSA in exchange for, *inter alia*, royalties and an exclusive, perpetual license to use the mark in connection with its Coaches Shows. The license agreement specifically provided that:

"SECTION 2 - LICENSE GRANT

2

2.1 IHSA hereby grants Intersport an exclusive, paid-up license to use the March Madness Mark in the following manner:

(a) in connection with entertainment services, namely the presentation of athletic and entertainment personalities in a panel forum; and

(B) to advertise, promote, and sell publications, videos, and media broadcasts in connection with section 2.1(a)."

The license agreement further provided that Intersport could not use the mark in any manner inconsistent with the above license grant. The agreement also provided that "[t]he term of this Agreement shall be perpetual." The parties also simultaneously entered into a perpetual marketing and representation agreement, under which Intersport agreed to "use all reasonable efforts to promote and further the licensing and use of the March Madness Marks in a manner consistent with this Agreement."

The NCAA claimed that its rights in the March Madness mark began in 1982, when CBS announcer Brent Musburger described the NCAA men's Division I basketball tournament as "March Madness." Litigation between the NCAA and the Illinois State High School Association continued from 1995 until 2000, when they agreed to pool their rights in the mark and form the March Madness Athletic Association (the MMAA). The written agreement between the IHSA and the NCAA forming the MMAA specifically provided that the IHSA thereby assigned the Intersport license agreement, exactly as written, to the MMAA.

In March 2006, Intersport entered into an agreement with Sprint, under which Intersport would provide Sprint with a variety of original programming to be disseminated to Sprint

customers via Sprint's mobile wireless media network. Intersport would also provide edited segments of its Coaches Show programming for dissemination over Sprint's mobile wireless media network.

The day after Intersport and Sprint announced their agreement, the NCAA sent Intersport and Sprint a letter asserting that if Intersport were to provide the Coaches Shows to Sprint for distribution to mobile communications subscribers, Intersport will have violated the license agreement. The NCAA also took the position that the term "media broadcast" as used in the license agreement should be interpreted in accordance with the definition of "broadcast" in the Federal Communications Act (47 U.S.C. §153(6) (2000)), which defines "broadcasting" as a distribution to the public via television or radio, and the federal regulations concerning personal communications services (47 C.F.R. §24.3 (2007)), which prohibit personal communications service providers from broadcasting as defined in the Federal Communications Act.

Intersport asserted that the language of its license agreement with the MMAA did grant it the authority to contract with Sprint to disseminate Coaches Show programming to mobile communications customers. Thus, Intersport sought a declaratory judgment proclaiming that Intersport was within its rights to use the mark "in connection with the Coaches Shows and 'to advertise, promote, and sell videos or media broadcasts' of the Coaches Shows to be distributed via *any* broadcast media," including video-enabled mobile wireless communications devices.

Intersport attached several items to its complaint, including the license agreement, the perpetual marketing and representation agreement, a letter from the NCAA dated November 15, 2000, indicating that the NCAA and the MMAA would honor Intersport's agreements with the

4

IHSA, and another letter from the NCAA dated March 10, 2006, warning Intersport that it considered Intersport's agreement with Sprint to be a violation of the license agreement. Attached to the March 10, 2006, letter was a Sprint press release, which announced that Sprint would be delivering "exclusive, made-for-mobile collegiate hoops programming to its customers." The press release quoted the vice-president of marketing for Sprint as saying, "Mobile phones offer so much more than just voice applications today." Among the "programming" or "on-demand video segments" offered to Sprint customers would be "installments" of the *March Madness Coaches Preview*. This programming would be provided by Intersport, which the release described as "an Emmy Award-winning creator, producer and distributor of original sports programming content and an industry leader in sports hospitality and event marketing." The press release further explained that the majority of this "mobile-exclusive content is free to Sprint Vision and Power Vision subscribers." The Sprint subscribers would be able to "enjoy" this content "on demand."

In their answer, defendants admitted that Intersport had been granted the license as alleged, but denied that the language of the license agreement encompassed distribution of the Coaches Shows for viewing on mobile communications devices. Defendants also raised two affirmative defenses and several counterclaims. The affirmative defenses were that Intersport had materially breached the license agreement by granting rights to use the mark to Sprint, which was prohibited by the agreement, and that Intersport's admitted and continued efforts to license the mark to third parties constituted a further material breach of the license agreement.

In their counterclaims, defendants asserted that Intersport's actions in intentionally

allowing Sprint to use the mark constituted a breach of contract as well as contributory and direct trademark infringement in violation of section 1114 of the Trademark Act of 1946 (15 U.S.C. §1114 (2000)). Defendants also alleged that Intersport's actions improperly gave Sprint the appearance of having been sanctioned or endorsed by the NCAA, allowing Sprint to be unjustly enriched. As such, Intersport's actions constituted contributory and direct unfair competition in violation of section 1125(a) of the Trademark Act of 1946 (15 U.S.C. §1125(a) (2000)), deceptive trade practices in violation of the Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.* (West 2006)), and unfair competition in violation of Illinois common law. Accordingly, defendants requested that the court deny Intersport the relief it had requested, enter a finding that Intersport's actions constituted a breach of the license agreement and trademark infringement, award the NCAA and the MMAA monetary damages, and permanently enjoin Intersport from using the mark. Intersport responded to these counterclaims by denying any liability.

Thereafter, defendants moved for partial summary judgment on Intersport's declaratory judgment claim and on their own breach of contract claim. Therein, they claimed that the plain and ordinary meaning of the terms used in the 1995 license agreement did not give Intersport the authority to stream content to consumers through a personal wireless communication system. In addition, defendants pointed out that the license agreement did not contain a later-developed technology clause. Intersport responded to defendants' motion for partial summary judgment asserting that it did not make sense to interpret its perpetual, exclusive, broadly worded license to broadcast the Coaches Shows as being limited to only the technology available in 1995.

Following a hearing, the court found that the license agreement was unambiguous and that the term "videos" encompassed any recorded visual production. The court further found the term "videos" not to be limited to a particular type of distribution, in contrast to "media broadcasts," which according to federal law governing the television industry, required distribution to the general public by television or radio. Thus, the court denied defendants' motion for partial summary judgment.

Thereafter, Intersport filed a "motion for the entry of judgment" based upon the grounds articulated by the court in its ruling on defendants' motion for partial summary judgment. The court granted the motion and entered a final judgment, reiterating :

> "Intersport has the exclusive right under the Intersport License Agreement to use the March Madness Trademark (as defined therein) in connection with entertainment services, namely the presentation of athletic and entertainment personalities in a panel forum (herein Coaches Shows) and to advertise, promote, and sell videos (defined as recorded visual presentations that could be distributed for the benefit and enjoyment of a viewer) of the Coaches Shows which may be distributed to the public in any manner, including but not limited to distribution to video-enabled mobile wireless media devices."

Defendants subsequently filed this timely appeal from that order.

Defendants now contend that the transmission of Intersport's Coaches Shows to Sprint's subscribers does not constitute selling videos within the meaning of the license agreement. Specifically, defendants claim that the plain and ordinary meaning of "videos" in 1995 implies

that there is a physical object in the hands of the end user. Defendants also claim that the "narrow language" of the license agreement does not include later-developed technology.

We must initially note that Intersport's "motion for the entry of judgment" was, in essence, a motion for judgment on the pleadings because the facts contained therein were not in dispute, the issue to be decided was a matter of law, and Intersport did not file a motion for summary judgment. See, e.g., Kim v. State Farm Fire & Casualty Co., 312 Ill. App. 3d 770, 772, 728 N.E.2d 530, 532 (2000) (in which the circuit court granted judgment on the pleadings interpreting an insurance contract in a declaratory judgment action). Section 2-615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(e) (West 2006)) provides that "[a]ny party may seasonably move for judgment on the pleadings." Judgment on the pleadings is proper where the pleadings disclose no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Gillen v. State Farm Mutual Automobile Insurance Co., 215 Ill. 2d 381, 385, 830 N.E.2d 575, 577 (2005). "A motion for judgment on the pleadings is akin to a motion for summary judgment limited to the pleadings." Kim, 312 Ill. App. 3d at 772, 728 N.E.2d at 532. "In ruling on a motion for judgment on the pleadings, the court will consider only those facts apparent from the face of the pleadings, matters subject to judicial notice, and judicial admissions in the record." Gillen, 215 Ill. 2d at 385, 830 N.E.2d at 577. On review, we must examine the pleadings to determine whether any genuine issue of material fact exists and, if not, whether the movant is entitled to judgment as a matter of law. Kim, 312 Ill. App. 3d at 772, 728 N.E.2d at 531. We review a circuit court's order granting judgment on the pleadings de novo. Kim, 312 Ill. App. 3d at 772, 728 N.E.2d at 531.

We now turn to the merits of the appeal. A license to use a trademark is a contract, and disputes over the language of a trademark license are governed by the rules of contract interpretation. 3 McCarthy on Trademarks and Unfair Competition §18:43, at 86 (4th ed. 1996); see, e.g., McDonald's Corp. v. Mazur, 127 Ill. App. 3d 608, 613, 469 N.E.2d 430, 434 (1984). The construction of a contract is an issue of law to be determined by the court. Avery v. State Farm Mutual Auto Insurance Co., 216 Ill. 2d 100, 129, 835 N.E.2d 801, 821 (2005). The court's primary objective in construing a contract is to ascertain and to give effect to the intent of the parties, so long as it does not conflict with any rule of law or public policy. Gallagher v. Lenart, 226 Ill. 2d 208, 232, 874 N.E.2d 43, 58 (2007); United States Trust Co. of New York v. Jones, 414 Ill. 265, 270, 111 N.E.2d 144, 147 (1953); see also 11 R. Lord, Williston on Contracts §31:4, at 274 (4th ed. 1999).

First, the court will examine the language of the contract alone, as the plain and ordinary meaning of the terms are the best indication of the parties' intent. Gallagher, 226 Ill. 2d at 233, 874 N.E.2d at 58. "[B]ecause words derive their meaning[s] from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." Gallagher, 226 Ill. 2d at 233, 874 N.E.2d at 58. In addition, "instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction [will be] regarded as one contract and will be construed together." Gallagher, 226 Ill. 2d at 233, 874 N.E.2d at 58.

Contract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties. Merchants Environmental Industries,

9

1-07-0626

Inc. v. SLT Realty Ltd. Partnership, 314 Ill. App. 3d 848, 863, 731 N.E.2d 394, 405 (2000). Quoting Judge Learned Hand, the Illinois Supreme Court has explained that " '[f]linch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words ***.' " Jones, 414 Ill. at 271, 111 N.E.2d at 147, quoting United States v. Klinger, 199 F.2d 645, 648 (2d Cir. 1952). The court must also place itself in the position of the parties at the time they entered into the agreement. 11 R. Lord, Williston on Contracts §31:9, at 340-41, §32:7 (4th ed. 1999); see also Meyer v. Marilyn Miglin, Inc., 273 Ill. App. 3d 882, 889, 652 N.E.2d 1233, 1238 (1995). To that end, the language in the contract may be enlarged or limited by the attendant circumstances of the contract and its purpose. Jones, 414 Ill. at 272, 111 N.E.2d at 147; see also 11 R. Lord, Williston on Contracts §31:9 (4th ed. 1999) (discussing the standard of local or limited usage of terms); 12 R. Lord, Williston on Contracts §34:1 (4th ed. 1999) (discussing usage).

Second, the court must determine if the contract language is ambiguous. Gallagher, 226 Ill. 2d at 233, 874 N.E.2d at 58. A contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of the language or due to the terms having more than one meaning. William Blair & Co. v. FI Liquidation Corp., 358 Ill. App. 3d 324, 334, 830 N.E.2d 760, 769 (2005). In contrast, a term is not ambiguous if a court can ascertain its meaning from the general contract language. William Blair & Co., 358 Ill. App. 3d at 334, 830 N.E.2d at 770. The mere fact that the parties disagree as to the meaning of a term does not render that term ambiguous. William Blair & Co., 358 Ill. App. 3d at 334, 830 N.E.2d at 770. Where there is no ambiguity, the court will ascribe to the terms their plain and ordinary meaning. William Blair &

10

Co., 358 Ill. App. 3d at 335, 830 N.E.2d at 770. In addition, the contract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered. Merchants Environmental Industries, 314 Ill. App. 3d at 863, 731 N.E.2d at 405, quoting Restatement (Second) of Contracts §222 Comment b, §223 Comment b (1981), and 5 W. Jaeger, Williston on Contracts §648, at 6-7 (3d ed. 1961); see also 12 R. Lord, Williston on Contracts §34:1, at 3-4 (4th ed. 1999) (indicating that contract language need not be ambiguous in order for usage to aid in interpretation).

The United States Court of Appeals for the Second Circuit has developed a test to determine whether a license agreement would permit the licensee to exploit the intellectual property in question through new channels made possible by technologies developed after the agreement was entered into. Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 486 (2d Cir. 1998). Specifically, " 'licensee[s] may properly pursue any uses which may reasonably be said to fall within the medium as described in the license.' " Boosey & Hawkes, 145 F.3d at 486, quoting Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 (2d Cir. 1968). Put another way, if the words used in the license agreement are broad enough to encompass the new use, and the new use is not completely unknown at the time of contracting, the burden of framing and negotiating an exclusion of that use falls on the grantor of the license. Boosey & Hawkes, 145 F.3d at 486. The Second Circuit added that the "new use" analysis should rely on neutral principles of contract interpretation rather than solicitude for either party. Boosey & Hawkes, 145 F.3d at 487. Thus, the Second Circuit determined that a license granted to the Walt Disney Company by composer Igor Stravinsky to use his musical composition "Rites

of Spring" "in any manner, medium or form," for use in the motion picture *Fantasia* was broad enough to include distribution of videocassette recordings of the film. Boosey & Hawkes, 145 F.3d at 485-86.

The license agreement at issue here provides that Intersport has the exclusive, perpetual right "to use the March Madness Mark" in connection with its Coaches Shows and to use the March Madness mark "to advertise, promote, and sell publications, videos, and media broadcasts" in connection with its Coaches Shows. The license agreement specifically provides that Intersport must comply with all applicable laws and regulations in conducting its activities using the mark.

As the circuit court found, the term "media broadcast" has a particular, limited meaning in the television industry. See Merchants Environmental Industries, 314 Ill. App. 3d at 863, 731 N.E.2d at 405; 11 R. Lord, Williston on Contracts §31:9 (4th ed. 1999); 12 R. Lord, Williston on Contracts §34:1 (4th ed. 1999). As section 153(b) of the Federal Communications Act provides (47 U.S.C. §153(6) (2000)), "broadcasting" is limited to the dissemination of programming to the general public via television or radio. Further, personal communications service providers are prohibited from broadcasting within the definition of the Federal Communications Act. 47 C.F.R. §24.3 (2007). Reading the license agreement in accordance with federal law, the term "media broadcast" as used in the license agreement cannot be said to encompass the dissemination of content on demand to specific, individual Sprint customers via Sprint's personal communications network for two reasons. See, e.g., Jones, 414 Ill. at 273, 111 N.E.2d at 148 (looking to the distinction between ordinary income and capital gains made in the federal income

12

tax code in order to construe a trust agreement in accordance with its purpose). First, dissemination of content on demand over a personal communications network does not come within the limited meaning of "broadcast" as defined in Federal Communications Act. Second, it would violate federal law if Sprint were to engage in broadcasting as defined in the Federal Communications Act. Therefore, the dissemination of Intersport's content to Sprint PCS customers on demand does not constitute a "media broadcast" within the meaning of the license agreement.

However, for the following reasons, we agree with the circuit court that the term "videos" is broad enough to encompass dissemination to mobile wireless media devices on demand. The Oxford English Dictionary, which is a highly accepted authority on the evolution of the meanings of words in the English language over the last millennium, explains that the term "video" is derived from the Latin verb *video, videre*, meaning, "I see, to see," and is patterned after the term "audio," which is Latin for "I hear." XIX Oxford English Dictionary 614 (2d ed. 1989). The advent of the use of the term "video" in the English language occurred in the late 1930s to describe the "sight channel in television, as opposed to audio, the sound channel." XIX Oxford English Dictionary 614 (2d ed. 1989), quoting Printer's Ink Monthly May 45/2 Video (1937). The Oxford English Dictionary defines the term "video" as "that which is displayed or to be displayed on a television screen or other cathode-ray tube," and also "a video recording; videotape as a recording medium." XIX Oxford English Dictionary 614 (2d ed. 1989).

However, it is clear that the definition of "video" has continued to evolve since 1989, when the second edition of the Oxford English Dictionary was published. Cathode-ray tube

televisions have been replaced by those with LCD and plasma screens. Moreover, the means for viewing video content is no longer limited to television.

Defendants have directed the court to the "best-selling" Newton's Telecom Dictionary as a source for meanings of the words used in the contract. Although defendants conspicuously failed to include the definition of "video" from the Newton's Telecom Dictionary, our research reveals that it defines "video" as:

> "From Latin, translated as 'I see,' video adds the element of sight to communications. While some of us are visually-oriented, and others of us are more oriented kinesthetically-oriented [*sic*] (learn by doing, as in with muscles and tendons and energy and sweat), we all find a communication to be enhanced through pictures... especially motion pictures. Motion pictures are the essence of video, and video is the essence of true and full communications." Newton's Telecom Dictionary 969 (22d ed. 2006).

This definition of "video" is much broader than the definition given in the Oxford English Dictionary and could be summarized as a visual communication. It is also significant that the Newton's Telecom Dictionary does not limit the manner or media in which video may be disseminated.

Defendants nevertheless maintain that the term "videos," because it is a noun, requires that a "video" be a tangible object and that the content be stored in a tangible form by the end user. However, neither the Newton's Telecom Dictionary nor the Oxford English Dictionary defines "video" as requiring that the content be stored in a tangible form. Significantly, the

Newton's Telecom Dictionary does not require that content be stored at all in order to constitute "video." Of course, the term "video" can also be combined with other words to indicate more specific uses of recorded visual content that can be displayed for a viewer, such as "video camera," "videocassette," "video-telephone," or even "video jockey," which is often shortened to "veejay." See XIX Oxford English Dictionary 614 (2d ed. 1989); see also Newton's Telecom Dictionary 969-70 (22d ed. 2006) (defining more than 30 compound terms using "video," including "video capture," "video pill," "Videophone," and "videotape.") Here, the term "video" is used without any such modifying word.

Therefore, we must ascribe the common meaning of the term "video" to the term as it is used in the contract here. As noted above, based on the Newton's Telecom Dictionary definition and the Oxford English Dictionary definition, "video" constitutes a "visual communication," especially when it involves moving images. Newton's Telecom Dictionary 969 (22d ed. 2006); XIX Oxford English Dictionary 614 (2d ed. 1989). We find that this definition is broad enough to encompass the recorded visual presentations of the Coaches Shows that Intersport would like to disseminate to Sprint PCS subscribers on demand. See Boosey & Hawkes, 145 F.3d at 486.

Defendants further assert, without citing any authority, that the dissemination of video on demand to a mobile wireless communication device could not have been contemplated in 1995. Therefore, they maintain, that Intersport and the IHSA could not have intended the term "videos" as used in the license agreement to include streaming video content to a mobile telephone.

However, the 2006 Draft Addition to the Oxford English Dictionary documents that as early as 1979, the dissemination of video content to mobile wireless communication devices was

foreseeable and that the term "video" was used to refer to that content. XIX Oxford English Dictionary 614 (2d ed. 1989), Draft Additions September 2006, *available at* http://www.oed.com (quoting the October 15, 1979, edition of U.S. News & World Report magazine). In addition, the Newton's Telecom Dictionary includes an entry for "Videophone 2500," which states:

> "In January, 1992, AT&T introduced a product called Videophone 2500, which transmitted moving (albeit slowly-moving) color pictures over normal analog phone lines. The phone carried a price tag [*sic*] $1,500 a piece. It was compatible with one MCI later introduced, made for it by GEC-Marconi of England and costing only $750 retail. Videophone 2500 relies on video compression from Compression Labs, Inc. of San Jose, CA. According to the New York Times, the phone took two years, about $10 million and 30 full-time people at AT&T to develop." Newton's Telecom Dictionary 970 (22d ed. 2006).

Therefore, at the time Intersport and the IHSA entered into the license agreement in 1995, the parties would have been able to contemplate distribution of video content to mobile wireless communications devices and comprehend this meaning of the term "video." See 11 R. Lord, Williston on Contracts §32:7 (4th ed. 1999) (explaining that the court must interpret the contract in light of the objectively determinable circumstances at the time that the contract was made). We accordingly find, as the Second Circuit in Boosey & Hawkes did, that the license agreement in question here encompasses the so-called "new use" of disseminating video content to mobile telephones and other mobile wireless communications devices. Boosey & Hawkes, 145 F.3d at 486. Indeed, if the IHSA and Intersport had intended the agreement to only encompass the sale

of videocassettes, then the license agreement could have used the term "videocassette" or some other more specific term. See, e.g., Wright v. Chicago Title Insurance Co., 196 Ill. App. 3d 920, 925, 554 N.E.2d 511, 514 (1990) (explaining that there is a strong presumption against provisions that could have easily been included in a contract, but were not).

We also find it significant that Intersport's license is exclusive and perpetual. The fact that there is no time limitation on the license, and no clause specifically excluding later-developed technology, suggests that the terms of the license should be interpreted broadly. Indeed, as the perpetual marketing and representation agreement, executed simultaneously with the license agreement (see Gallagher, 226 Ill. 2d at 233, 874 N.E.2d at 58) provides, Intersport had an obligation to promote and further the licensing and use of the March Madness Marks. Intersport's agreement with Sprint accomplishes this purpose. For all of these reasons, we find that the license agreement does encompass the right to disseminate video content to mobile wireless communications devices on demand.

Defendants assert that this conclusion would render the use of the term "media broadcast" in the license agreement superfluous. Defendants claim that we must read "media broadcasts" as a limitation on Intersport's rights with respect to "videos."

We disagree. The license agreement cannot be read as limiting the manner in which Intersport may disseminate "videos." The entire license grant, although spread over multiple subsections and clauses, actually consists of a single sentence. Pared down to its empirical elements, the grant would read: the IHSA grants Intersport a license. The license is further described by the infinitive verb forms in the sentence. The IHSA grants Intersport a license "to

17

use," but also "to advertise," to "promote," and to "sell." Focusing on subsection (b) of the grant, "publications, videos, and media broadcasts" are what Intersport may "advertise, promote, and sell." The term "videos" is used in a parallel sentence construction with the term "media broadcasts." Therefore, it cannot be said that the term "videos" is in any way modified or limited by the term "media broadcasts." As a result, the license agreement cannot be read as limiting or qualifying the manner in which the videos may be advertised, promoted or sold, nor can it be read as dictating how the video content must be stored, maintained, transmitted, or disseminated. The license agreement also does not limit to whom Intersport may "sell" the videos. Thus, the sentence structure of the license grant endows Intersport with broad power to use the mark in connection with its Coaches Shows in several independent ways.

In reaching this conclusion, we find the two cases that defendants discuss at length in their opening brief, Cohen v. Paramount Pictures Corp., 845 F.2d 851 (9th Cir. 1988), and Rey v. Lafferty, 990 F.2d 1379 (1st Cir. 1993), to be distinguishable from the present case. Both of those cases involved agreements limiting distribution to "television," which is a more specific term than "video." See XIX Oxford English Dictionary 614 (2d ed. 1989) (defining video as including, but not being limited to, visual images capable of being displayed on television). Further, as we explained above, the term videos, as used in the license agreement, is not limited to any particular medium of distribution.

We must now address defendants' second over-arching contention on appeal, in which they claim that the circuit court effectively rewrote the parties' license agreement in its order. Contrary to defendants' position, the court did not rewrite the contract. The interpretation and

enforcement of a contract as it was written does not constitute the rewriting of the contract. See, e.g., Wright, 196 Ill. App. 3d at 925, 554 N.E.2d at 514 (explaining that where a contract is clear and unambiguous, a court will not add terms to reach a more equitable result). Indeed, to interpret the term "video" as requiring some tangible storage by the end user, such as on a videocassette or DVD, as defendants would have the court do, would be more akin to rewriting the contract. Such an interpretation would essentially amount to adding the terms "cassette" or "DVD" to the contract. See, e.g., Wright, 196 Ill. App. 3d at 925, 554 N.E.2d at 514 (adding terms where the contract is silent amounts to rewriting the contract); see also Lakeland Property Owners Ass'n v. Larson, 121 Ill. App. 3d 805, 809, 459 N.E.2d 1164, 1168 (1984) (also explaining that a court may not add a provision to a contract, even to make the contract more equitable).

Defendant's final contention is that the circuit court lacked a sufficient factual basis to enter judgment on the pleadings. The construction of an unambiguous contract based on the plain and ordinary meaning of its terms is an issue of law capable of being resolved without consideration of extrinsic evidence. Cf. William Blair & Co., 358 Ill. App. 3d at 334, 830 N.E.2d at 769 (explaining that where ambiguity does exist, the court must consider extrinsic evidence, and judgment as a matter of law would be inappropriate). Further, because the license agreement does not limit the manner in which "videos" may be disseminated, it would be of no consequence for the court to hear evidence on how the video content actually makes its way from Intersport, to Sprint, and then through the ether to an individual subscriber's mobile telephone.

For these reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

GREIMAN and CUNNINGHAM, JJ., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

INTERSPORT, INC.,

    **Plaintiff-Appellee,**

    **v.**

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and MARCH MADNESS ATHLETIC ASSOCIATION, L.L.C.,**

    **Defendants-Appellants,**

**No. 1-07-0626**

**Appellate Court of Illinois**
**First District, Third Division**

**Filed: March 26, 2008**

**JUSTICE THEIS delivered the opinion of the court.**

**Greiman and Cunningham, JJ., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Stuart Palmer, Judge Presiding**

| | |
|---|---|
| **For DEFENDANTS - APPELLANTS** | **Antony J. McShane** <br> **Michael G. Kelber** <br> **Hillary A. Mann** <br> **Neal, Gerber & Eisenberg LLP** <br> **2 N. LaSalle St., Suite 2200** <br> **Chicago, IL 60602** |
| **For PLAINTIFF - APPELLEE** | **Paul E. Veith** <br> **Michael C. Andolina** <br> **April D. Lambert** <br> **Sidley Austin LLP** <br> **1 S. Dearborn St.** <br> **Chicago, IL 60603** |